316 F.2d 163
 COMPAGNIE De NAVIGATION FRAISSINET & CYPRIEN FABRE, S.A. and
S. S. ALLOBROGIA, Appellants,
v.
MONDIAL UNITED CORPORATION, Appellee.
MONDIAL UNITED CORPORATION, Appellant,
v.
S. S. EXMOOR, her engines, etc., and Compagnie De Navigation
Fraissinet& Cyprien Fabre, S.A., Appellees.
 No. 19695.
 United States Court of Appeals Fifth Circuit.
 April 4, 1963.
 
 Frank J. Marston, Scott, McCarthy, Preston & Steel, Miami, Fla., for appellant S.S. Allobrogia.
 Talbot D'Alemberte, Fowler, White, Gillen, Humkey & Trenam, Miami, Fla., for appellant Compagnie de Navigation Fraissinet et Cyprien Fabre, S.A.
 Dwight Sullivan, James A. Dixon, Jr., Dixon, Dejarnette, Bradford, Williams, McKay & Kimbrell, Miami, Fla., for appellee Mondial United Corp.
 Before BROWN, GEWIN and BELL, Circuit Judges.
 JOHN R. BROWN, Circuit Judge.
 
 
 1
 This appeal and cross appeal from admiralty decrees allowing recovery for cargo damage presents five principal questions. The first is whether the evidence is sufficient to sustain cargo's burden and the finding of Carrier fault. The second, as to both appeal and cross appeal, relates to the computation of damages, and the third to mitigation of damages. The fourth concerns the standing of the libelant corporation to recover since it was not the shipper or consignee as such. And fifth is the question whether, as to one of the two vessels involved, the decree for cargo should have run against the vessel owner as well as the charterercarrier.
 
 
 2
 Brought as two separate libels, they were properly consolidated for trial and appeal. Recovery was sought for damage to Italian window glass caused largely by stain from moisture. Four separate shipments moved under four bills of lading. Two shipments of 256 crates were on the SS EXMOOR and two of 325 crates on the SS ALLOBROGIA. Each of the two libels was in personam against the Fabre Line[1] and in rem against the particular vessel.[2] The shipments on the SS ALLOBROGIA were received by Fabre Line at Leghorn, Italy, March 18, 1960, those on the EXMOOR February 24-25, 1960, for carriage to Port Everglades, Florida.
 
 
 3
 On the trial the Judge saw and heard all of the witnesses. This included those who testified concerning the condition of the cargo on outturn, the nature and extent of the damage, and the dollar valuation thereof. On this record he concluded that the cargo had sustained its burden of proving damage for which the Carrier was responsible. The libelant did not undertake to offer extraneous evidence on the actual nature of the goods at the time of delivery to the Carrier in Italy. It was content to rely upon clean bills of lading[3] which, the Court found, acknowledged the receipt of the goods by 'the carrier and ship in good order and condition' and 'with no exceptions'.
 
 
 4
 Starting with this premise, the Court on the basis of the evidence offered then found that on discharge from each of the vessels, the cargo was 'in a condition inconsistent with (the) apparent good order when loaded.' On outturn 'many of the crates were twisted, some had broken boards, and the majority were stained and discolored, and in some it was easily discernible * * * that the contents were damaged * * *.' Port Everglades Terminal Company, acting apparently as stevedore and certainly as agents for Fabre Line, noted certain exceptions to the cases of glass on discharge. Exception was taken, the Court found, to 'staining, mold, moisture, twisting and breaking.' Formal written notice of damage was given by the Consignee on the date of delivery of the SS EXMOOR shipments, and within three days as to one of the ALLOBROGIA shipments. Notice as to the remaining shipment was sent within 18 days.[4] Thereafter joint surveys were held by surveyors representing the consignee and the Carrier. These surveyors were in substantial agreement as to the nature and extent of damage, and there is no suggestion in the record that the damage as found by them initially occurred between date of discharge from the vessel and the survey.[5] A small amount of the damage resulted from some of the glass being broken or shattered within the cases. The principal damage, however, was stain from moisture. Some of the glass was so badly stained that it had to be discarded as unmarketable or the stain cut and trimmed away. Of that not yet stained, much of it was moist requiring extensive steps to unpack, dry and clean the glass.
 
 
 5
 In effect the Carrier[6] contends that all the libelant proved was that the goods were delivered in bad condition. And this, it continues, is insufficient since there was no evidence showing receipt by the Carrier in good condition. This is based on the fact that the recitations in the clean bills of lading purported to state the apparent condition of the cargo which was, however, restricted to the external wooden cases. With contents of the cases concealed, the Carrier could not have made representations as to the condition of the glass.
 
 
 6
 We agree with the Carrier that this is the crucial issue on the appeal. The damaged condition on outturn was overwhelmingly established. And there was more than ample evidence to justify the Court's inference that this was attributable to conditions arising during water transportation. In this latter respect, the record is more favorable to cargo than it would have to be. For assuming good order on receipt and bad order on outturn, the burden was then on the Carrier to show that the damage was brought about by an excepted cause. Here the only two remotely helpful to the Carrier were those found in 1304 of C.O.G.S.A., (c) perils of the sea and possible (m) inherent vice or defect of the goods. This was based largely on the assumptions expressed by all of the experts that the most likely source of the excess moisture on the glass plates was sweating resulting inevitably from air striking surfaces during temperature and humidity changes. But to show this as an excepted peril, the Carrier in effect has to absolve itself from negligence by showing that despite prompt, timely, prudent and adequate steps in ventilation and protective measures, the sweating nontheless occurred from the inescapable conditions of ocean carriage.[7]
 
 
 7
 The Carrier's proof did not begin to suggest even the slightest suspicion of a whisper of a possible exoneration. Not a single ship's officer was proffered as a witness either by deposition or in court. The vessel's logbooks, despite the Court's order to do so, were never produced. And the damage on the SS EXMOOR-- comprising as it does 75% Of the total dollar claimed-- was traced even closer to active carrier fault from improper stowage near or with granite chips which either were, or had been allowed to become, wet.
 
 
 8
 Of course it was the Carrier's lawful right to put the libelant to its proof and for its defense stand upon the insufficiency of evidence of delivery of the cargo to the Carrier in good order and condition. Prevailing on that score, proof by the Carrier on actual care and custody of the goods would have been superfluous. The course, however, was a risky one and had its own particular perils, as its able proctors well knew. And the entire want of any evidence remotely suggesting that the cargo was properly cared for while in Carrier's custody is itself a factor which the Judge was entitled to credit.[8] This factor was significant as the Judge undertook to evaluate the evidence which had been offered and which showed that proof of apparent external good order and condition was an adequate basis for inferring good order and condition of the contents.
 
 
 9
 This evidence came from an executive of the consignee who was experienced in the shipment, handling, storage, and distribution of imported glass, including the manner in which it was packaged and tendered for shipment in Italy. He testified that had the glass sheets in the cases been covered with moisture as they were on outturn, the external appearance of the wooden cases at time of shipment would have been similar to that revealed on discharge. This would have been, he stated, especially true as to extensive staining and discoloration of the wooden cases. Adding substance to this view was the record proof showing that hundreds of thousands of feet of glass was carried and imported with but slight moisture damage of this kind.
 
 
 10
 Whether a particular type of damage is such as to produce the external appearances found on discharge thus giving rise in turn to an inference that such damage was nonexistent at the time of loading is, by its very nature, a question of fact. Reider v. Thompson, 5 Cir., 1952, 197 F.2d 158, 161. Where because of the perishable or intrinsic nature of the commodity, the internal condition is not adequately revealed by external appearances, cargo may have a considerable burden of going further to prove actual condition.[9] But here the proof from a knowledgeable source was substantially uncontradicted. Not even the ship's surveyor ventured to deny this factual statement or to suggest that the existence at time of shipment of the extensive moisture of the kind found on outturn would not have been revealed through stains and damage to the cases. Indeed, about all he attempted to do was to assert two things. The first was that staining and discoloration might have come from sap or moisture in the wood itself, and therefore condition of contents was not necessarily indicated by external appearances. The second was that the moisture undoubtedly resulted from sweating. But this latter point was neither revealing nor legally significant unless his principal was to go forward with proof of due care in the prevention of this particular sea peril. (See note 7, supra)
 
 
 11
 On the liability phase the case was the classic one of a fact resolution by the Judge that the cargo was in good condition on receipt and in bad order on delivery. In the void which the Carrier's absolute silence here creates the policy of the law reveals its wisdom: explain what took place or suffer the consequences.
 
 
 12
 Little need be said about the computation of damages. The surveyors who were called in jointly to represent the interest of cargo and Carrier respectively made survey examinations of so many of the cases as they, in their judgment, thought adequate to reveal the condition of the contents of the cases, the nature and extent of the damage, and the steps needed to be taken either in rejecting or rehabilitating the glass. The testimony showed without dispute that had every case been opened and every pane of glass examined, the cost would have been unreasonable, impractical and prohibitive. The two-- on behalf of their respective principals-- made a practical judgment on what ought to be done. On the basis of the examination of the cases and contents thought by them to be sufficiently representative, they then 'projected' the cost for taking similar action with respect to the remainder in each particular shipment. The Carrier by a process which quite ignores our function now that we no longer retry admiralty cases de novo, Yacht Mary Jane v. Broward Marine, Inc., 5 Cir., 1963, 313 F.2d 516, undertakes through its legal spokesman to question the accuracy or reliability of figures put forward and agreed to by its practical cargo claims representative. Nothing in Beck v. Vizcaya, E.D.Pa., 1949, 88 F.Supp. 818, 1949 A.M.C. 1923, Aff'd, 3 Cir., 1950, 182 F.2d 942, 1950 A.M.C. 1636, nor anything before or since McAllister importing into admiralty a salt water version of F.R.Civ.P. 52(a), affords any basis for our saying that what the trial Judge concluded the Carrier's knowledgeable expert thought fair, reasonable and practicable is 'clearly erroneous' in the eyes of the law.[10]
 
 
 13
 For much the same reason, we may quickly dispose of the contention here urged that the District Court erred in not reducing the award substantially because the damage was caused primarily by the failure of the consignee to minimize the loss. The assertion rests on the combination of dual facts. The first is that a considerable time elapsed between discharge from the vessel and the rehabilitory salvage work performed shorty after the joint surveys. The second one is the failure to follow the frequent practice of purposefully wetting down the cases so they remain thoroughly saturated until they can be opened, the glass plates removed and dried. But this was again not a principle of law, maritime, landbased or amphibious. It is a factual problem. Though one which a carrier may properly assert since there is a duty on the consignee to mitigate cargo damage, it is nevertheless a defense in extenuation. It operates on the working assumption that some damage for which the ship is responsible has occurred, but that proper steps will reduce or retard the damage. The Carrier is therefore faced with the somewhat formidable task-- which Judge Browning has characterized as 'a burden which may be difficult if not impossible to meet'[11] -- of first distinguishing between damage for which it is, and is not responsible,[12] and second, shouldering the burden of any actor who asserts the doctrine of avoidable consequences.[13] In this situation we cannot conclude that the Judge's findings were clearly erroneous.
 
 
 14
 We do think, however, that the cross appeal by cargo should be sustained. In doing so, we do not re-evaluate proof or conclude that the District Court was clearly erroneous in a fact finding. What the Judge did on this phase was to reduce the award for one of the shipments on the SS EXMOOR from $10,945.55 to $7,000.00. The larger figure was the amount based on the so-called 'projection' of the loss approved, first, by the joint surveyors and now affirmed by us as a permissible means of arriving at a practical judgment resting on fairly representative sampling. Adopting this 'projection' as he did, the Judge did not reject its application because of some factor peculiar to this shipment. Rather, it was on the ground that on this particular loss, libelant had so far only paid approximately $7,000 to the consignee. Consequently, the Court ruled its loss should likewise be restricted. The record showed, however, that the loss was sustained in fact and that libelant would be obligated to pay the shipper or consignee the full amount once it was ascertained. The problem really relates to the standing of libelant to sue and recover. For the reasons next discussed, this is essentially a question of protection against double claims. The decree is accordingly modified and remanded with directions to the District Court to allow the full amount subject to a satisfactory showing on remand against the likelihood of double payment.
 
 
 15
 There is no substance to the contention that the libelant lacked standing to sue and recover. True, Mondial United Corporation was neither the shipper nor the consignee. The shippers were two foreign concerns in Italy. The consignee, as to each shipment, was Glass Arts, Inc., a corporation having substantial relation to Florida and whose executive officer appeared as a witness and from whom decisive testimony was obtained on the liability feature. Libelant was not, however, a complete stranger to these goods. It acted as a commission agent for the manufacturers. Under the evidence, libelant was the party to whom both the shipper and consignee of the goods looked for payment for the goods, the delivery of the bills of lading, the adjustment of claims for loss or damage, and the like. The record was undisputed that as to three of the four shipments, Mondial had paid Glass Arts, Inc. in full for the amounts allowed by the decree. As to the fourth shipment-- discussed above in connection with the cross appeal-- only approximately $7,000 had been paid pending receipt of further information, insurance settlements, etc.
 
 
 16
 While this is another instance in which this case has been needlessly complicated by the failure to offer formal proof on matters which, as a practical matter, are really not open to any serious question, we think Mondial established a sufficient relationship to entitle it to recover. M. W. Zack Metal Co. v. SS Birmingham City, 2 Cir., 1961, 291 F.2d 451, 1961 A.M.C. 1545. By virtue of that relationship to the goods and the other parties interested in them, it sustained an actual loss. It stands substantially as an equitable assignee or subrogee. It is not, then, the case of a mere interloper who, sustaining no damage, nevertheless recovers a substantial amount. There is at most only a risk that after payment to Mondial, the Carrier might have to pay another. But these apprehensions and those expressed in Aunt Jemina Mills Co. v. Lloyd Royal Belge, 2 Cir., 1929, 34 F.2d 120, 1929 A.M.C. 1141, are matters for practical determination. This danger is effectually avoided by requiring libelant on the remand of this case to make the simple showing that this item warrants.[14]
 
 
 17
 This leaves only the contention of the claimant to the SS ALLOBROGIA that the Court erred in entering a decree in rem against the vessel since the vessel was not the Carrier. This seems to be based on the proposition that the vessel was under charter by her owners to Fabre Line.
 
 
 18
 Here again the case has been needlessly complicated by failure to bring forward purely formal proof. But in this void the shipowner is the one to suffer when in the face of undisputed physical facts it seeks to exonerate itself from any responsibility whatsoever for goods carried by the ship. Bills of lading were issued for the Master. The goods were loaded aboard the vessel, transported on her and discharged from the ship at the port of destination. In the absence, then, of clear evidence showing a contractual relationship between owner and charterer of a kind which would absolve the vessel and her owners from all responsibility for cargo, the vessel (and her owner as Claimant) is a 'carrier' as that term is used in 1301 of C.O.G.S.A. With that status, the vessel thereby became subject to the liabilities and responsibilities imposed under 1304. Likewise it bears the burden of the presumptions imposed expressly under 1303(3)(c) and the prior maritime law which establish a prima facie case from the receipt of cargo in good order and outturn in bad condition. See Instituto Cubano DeEstabilizaction Del Azucar v. T/V Golden West, 2 Cir., 1957, 246 F.2d 802, 1957 A.M.C. 1481. This is not pressing the fictional personification of the vessel to new and unrealistic extremes. Cf. Bennett v. The Mormacteal, E.D.N.Y., 1957, 160 F.Supp. 840, 1958 A.M.C. 870, aff'd, 2 Cir., 1958, 254 F.2d 138, 1958 A.M.C. 874; Smith v. The Mormacdale, 3 Cir., 1952, 198 F.2d 849, 1952 A.M.C. 1340; Samuels v. Munson S.S. Line, Inc., 5 Cir., 1933, 63 F.2d 861,1933 A.M.C. 515; Reed v. S.S. Yaka, 3 Cir., 1962, 307 F.2d 203. As hoary as the classic nautical aphorism of the seaman's lien for wages extending to the last plank,[15] the notion is deeply ingrained that once the cargo is aboard, the cargo is bound to the ship and the ship is bound to the cargo.[16] Responsibility of the vessel, and not her distant, unavailable, inaccessible owner or without reliance on the presence of some impecunious, irresponsible, temporary user, serves a useful purpose in the law. See 1 Benedict, Admiralty, 11, 12, pp. 17, 22 (Knauth's ed. 1940). And 'useful for this purpose still,' the law even in this 'day and generation' affords effectual utility to the in rem liability of the ship. Continental Grain Co. v. Barge F.B.L. 585, 1960, 364 U.S. 19, 80 S.Ct. 1470, 4 L.Ed.2d 1540,1960 A.M.C. 249; and Smith v. The SS Mormacdale, supra, 198 F.2d 849, 850. If this judicial peril is more than the owner wants to bear, he can by secondary one. See American Tobacco Co. v. SS Katingo Hadjipatera, 2 Cir., 1951, 194 F.2d 449, 1951 A.M.C. 1933.
 
 
 19
 The decrees except as modified herein are therefore affirmed, and the cases are remanded to the District Court for further and not inconsistent proceedings.
 
 
 20
 Modified, and as modified, affirmed and remanded.
 
 
 
 [1]
 The full name is Compagnie De Navigation Fraissinet & Cyprien Fabre, S.A. The libels described the Respondent Fabre Line as a common carrier of an undisclosed type to Fabre Line
 
 
 [2]
 Cargo concedes before us that the decree in rem against the SS EXMOOR should be vacated as the vessel was never arrested, claimed, or answer filed on her behalf
 
 
 [3]
 The bills of lading incorporated the terms of the Carriage of Goods by Sea Act, 46 U.S.C.A. 1300 et seq
 
 
 [4]
 Out of the total provable damages of $17,939.57, the claims covered by notice within the three days prescribed by C.O.G.S.A. 46 U.S.C.A. 1303(6), exceeded 80%
 
 
 [5]
 There is, of course, the third contention that from failure to take timely prudent steps the damage from moisture stains was aggravated
 
 
 [6]
 In this discussion we use the term to include both the Fabre Line and the Claimant of the SS ALLOBROGIA
 
 
 [7]
 'Sweat * * * can be regarded as a peril of the sea only when all available and reasonable precautions are taken to avoid it. * * * The carrier remains liable if it fails to provide, without excuse, sufficient ventilation, or if its improper stowage contributes to the sweat.' Wessels v. The Asturias, 2 Cir., 1942, 126 F.2d 999, 1000, 1942 A.M.C. 360. See also General Foods Corp. v. United States, S.D.N.Y., 1952, 104 F.Supp. 629, 1952 A.M.C. 310; and the extensive discussion by Judge Roche, California Packing Corp. v. States Marine Corp., N.D.Cal., 1960, 187 F.Supp. 540, 542, 1960 A.M.C. 2203; California Packing Corp. v. The Empire State, N.D.Cal., 1960, 180 F.Supp. 19; California Packing Co. v. SS & T Voyager, N.D.Cal., 1960, 180 F.Supp. 108, 1960 A.M.C. 1475
 
 
 [8]
 It also relieves us of any anxiety which we might entertain under the clearly erroneous concept that the decree though perhaps just barely supported by 'substantial' evidence does not represent the truth and right of the case. See W.R.B. Corporation v. Geer, 5 Cir., 1963, 313 F.2d 750, 753
 
 
 [9]
 Nearly all of the cases in this more troublesome area involve produce or similar natural commodities. See The Daido Line v. Thomas P. Gonzalez Corp., 9 Cir., 1962, 299 F.2d 669, 1962 A.M.C. 1295, note 5; American Tobacco Co. v. Goulandris, 2 Cir., 1960, 281 F.2d 179, aff'g. 173 F.Supp. 140; The Niel Maersk, 2 Cir., 1937, 91 F.2d 932, 1937 A.M.C. 1646, cert. den., 1937, 302 U.S. 753, 58 S.Ct. 281, 82 L.Ed. 582; Hecht, Levis & Kahn, Inc. v. SS President Buchanan, 2 Cir., 1956, 236 F.2d 627, 1956 A.M.C. 1970; Yeckes-Eichenbaum, Inc. v. Texas Mexican Ry., 5 Cir., 1959, 263 F.2d 791; the California Packing Co. cases, note 7, supra
 
 
 [10]
 We do not rest this on a holding that the surveyor had authority to make any binding agreement as such. Rather it is a classic case of an admission in its true sense. The law of admissions is primarily the law of agency, not evidence. The surveyor was hired to inspect and report his conclusions and recommendations. In reporting he was doing exactly what he was employed to do. Since part of his acts were to be reported words, his statement was within his authority. As such it is admissible as an admission from which the trier could draw inferences. McCormick, Evidence 244 (1954); Cox v. Esso Shipping Co., 5 Cir., 1957, 247 F.2d 629, 633, 1957 A.M.C. 1927
 
 
 [11]
 The Daido Line v. Thomas P. Gonzalez Corp., 9 Cir., 1962, 299 F.2d 669, 671, 1962 A.M.C. 1295
 
 
 [12]
 The Vallescura, 1934, 293 U.S. 296, 55 S.Ct. 194, 79 L.Ed. 373, 1934 A.M.C. 1573
 
 
 [13]
 Southport Transit Co. v. Avondale Marine Ways, Inc., 5 Cir., 1956, 234 F.2d 947, 1956 A.M.C. 1498
 
 
 [14]
 Within the discretion of the District Court, this may be in the form of authenticated assignments, transfers, releases, or the like from the shippers and consignees showing to the Court's reasonable satisfaction that Mondial is now the owner of all such claims, or that all others having any substantial basis for a claim have relinquished them
 This will automatically care for the additional item to be awarded in the SS EXMOOR case from our reversal on cargo's cross appeal.
 
 
 [15]
 Justice Story in The John G. Stevens, 1898, 170 U.S. 113, 119, 18 S.Ct. 544, 546, 42 L.Ed. 969, '* * * seamen's wages * * * are sacred liens, and, as long as a plank of the ship remains, the sailor is entitled, against all other persons, to the proceeds as a security for his wages'; see Findley v. Lanasa, 5 Cir., 1960, 276 F.2d 907, 909, 1960 A.M.C. 1444
 
 
 [16]
 Osaka Shosen Kaisha v. Pacific Export Lumber Co., 1923, 260 U.S. 490, 497, 43 S.Ct. 172, 67 L.Ed. 364, 1923 A.M.C. 55:
 'This lien * * * is founded on the rule of maritime law as stated by Cleirac, (597:) 'Le batel est obligee a la marchandise et la marchandise au batel.' The obligation is mutual and reciprocal. The merchandise is bound * * * to the vessel for freight and charges * * * and the vessel to the cargo.' Gilmore & Black, Admiralty 3-45 (1957). Cf. Carbon Black Export, Inc. v. The Monrosa, 5 Cir., 1958, 254 F.2d 297, 1958 A.M.C. 1335, cert. dismd., 359 U.S. 180, 79 S.Ct. 710, 3 L.Ed.2d 723. See also 1303(8) of C.O.G.S.A.:
 '(8) Any clause, covenant, or agreement in a contract of carriage relieving the carrier or the ship from liability for loss or damage to or in connection with the goods, arising from negligence, fault, or failure in the duties and obligations provided in this section, or lessening such liability otherwise than as provided in this chapter, shall be null and void and of no effect. A benefit of insurance in favor of the carrier, or similar clause, shall be deemed to be a clause relieving the carrier from liability.'