**HUNT FOODS AND INDUSTRIES, INC.,**
Libelant,

v.

**MATSON NAVIGATION COMPANY and
the S.S. HAWAIIAN TOURIST,**
Respondent.

No. 5104.

United States District Court
E. D. Louisiana,
New Orleans Division.

Jan. 11, 1966.

Montgomery, Barnett, Brown & Read, John B. Gooch, Jr., New Orleans, for Hunt Foods and Industries, Inc.

Phelps, Dunbar, Marks, Claverie & Sims, John Poitevent, New Orleans, for Matson Navigation Co. and the SS Hawaiian Tourist.

Lemle & Kelleher, Thomas W. Thorne, Jr., New Orleans, La., for T. Smith & Son, Inc.

AINSWORTH, District Judge:

Hunt Foods and Industries, Inc. has filed this libel against Matson Navigation Company and its vessel, the SS HAWAIIAN TOURIST, to recover damages to a large shipment of packages of cottonseed oil and related products on an ocean voyage from New Orleans to Honolulu. Matson has made T. Smith & Son, Inc., the stevedore company which loaded the cargo, a third-party respondent.

The HAWAIIAN TOURIST loaded the cargo in New Orleans on January 18–20, 1961, and discharged cargo at Honolulu on February 6, 1961. The shipment was made pursuant to the Carriage of Goods by Sea Act, 46 U.S.C. § 1300 et seq.

A clean bill of lading was issued by Matson to Hunt showing receipt of the merchandise in good order and condition. It was stowed in the tween deck spaces of No. 3 and No. 4 holds of the HAWAIIAN TOURIST. A 10½-ton tractor was loaded in the square of the tween deck space of No. 3 hold, but athwartship rather than fore and aft and without lashings. On arrival at Honolulu it was discovered that many of the packages were broken, stained, crushed, leaking and rusting and a portion thereof was short. The 10½-ton tractor had shifted during the voyage causing considerable damage to Hunt's cargo. Additional rust damage was also discovered.

Respondent Matson admits there was damage and shortage upon the delivery of libelant's cargo and concedes that libelant has established a prima facie case by proving external apparent good order and condition upon receipt by the carrier and damage and shortage upon delivery. Respondent accepts its burden under COGSA to prove that the damage was occasioned by one or more of the excepted perils of the sea. The burden of proof is on the ocean carrier to show that the damage and shortage was occasioned by an excepted cause under the Carriage of Goods by Sea Act. Orient Ins. Co. v. Flota Mercante del Estado, E.D.La., 1951, 102 F.Supp. 729, affirmed 5 Cir., 1952, 198 F.2d 740; Compagnie De Navigation, Etc. v. Mondial United Corp., 5 Cir., 1963, 316 F.2d 163.

There is no question about respondent Matson's liability for shortage of cargo and no defense is apparently made to this part of the claim. The evidence shows that both Hunt's and Matson's surveyors agreed as to the amount of such shortage.

Undertaking its burden of proof, respondent Matson first attempted to show that Hunt's packaging of its products which were shipped on the HAWAIIAN TOURIST was inadequate. In

our opinion it fell short of its burden and the preponderance of the evidence supports libelant rather than Matson. The evidence shows that the packages were unloaded at point of origin on the wharf at New Orleans, package by package. The clerk at the wharf rejected any package which was questionable or not acceptable to him even if the imperfections were sometimes minute. Careful examination of the packages was made and rejected packages were immediately returned to Hunt's plant. Hunt's plant traffic manager for twenty-three years testified that he had never had cargo rejected because of improper or insufficient packaging by any type of carrier, ocean, rail, etc., nor had he received any complaints from anyone about improper packaging.[1]

The packaging was done manually at the Gretna (New Orleans) plant by Hunt (except for some of the shortening products which were produced at Memphis and Chicago plants and transported to the Gretna plant) and numerous checks and controls were maintained in the Gretna plant. Fiberboard pads were used on top of the Wesson Oil cans to distribute the weight. Glass containers were manufactured by Owens-Illinois Glass Company and tin containers by American Can Company. We are not impressed with the testimony about the United States Government's packaging requirements of these products, for the uses to which the Government's packages are to be put are substantially different from those in ordinary commerce. The survey reports indicate that the claims are largely for broken bottles and dented and leaking cans. There is no indication that packaging had anything to do with the damage sustained. Respondent's witness, Westling, spent about an hour in Hunt's Gretna plant and testified that he considered the packaging procedures inadequate. His inspection was superficial at best, and he was not an expert on packaging. On the whole, we believe the evidence strongly supports a finding that packaging of Hunt's cargo was not the cause of the damage, that the packaging was sufficient to withstand the ordinary hazards of an ocean voyage, and Matson has failed to sustain its position in this regard.[2]

Matson also attempted to show that the sweat or rust damage was due to a peril of the sea and conceded again that it has the burden of proof, but contended that it is not liable for sweat damage if it can show that all available and reasonable precautions were taken to avoid it. See California Packing Corp. v. States Marine Corp. of Del., N.D.Calif., 1960, 187 F.Supp 540. The evidence shows that the cargo holds containing libelant's goods were sealed upon departure from New Orleans and not ventilated or opened until arrival at Honolulu. Matson's expert, Westling, testified that atmospheric conditions existing in the hold where libelant's canned goods were stored were such that condensation or sweat should not have occurred during this voyage. The square of the hatch on the weather deck was covered with tarpaulins, fuses were pulled from the motor-driven ventilators to make them inoperative, and covers were placed over the intake ducts. However, the evidence also shows that the goods were loaded in the hold next to the engine room and that there were no damper valves on the intake vents to seal them off when the motors were inoperative. The chief mate admitted that even if the openings are closed in the normal manner, they would not be air tight. The exhaust vents were not covered or closed in any manner. Matson's witness, Westling, testified that it was unnecessary to close the exhaust vents but this contradicted his writings on the subject of sweat damage in which he wrote that "ventilation tight" infers that all supply and *exhaust* ventilation

---

1. Hunt's Wesson Oil Company is the No. 1 producer in the cottonseed oil field and the second leading producer of shortening.

2. See California Packing Corp. v. States Marine Corp. of Del., N. D. Calif., 1960, 187 F.Supp. 540; Tri-Valley Packing Ass'n v. States Marine Corp. of Del., 9 Cir., 1962, 310 F.2d 891.

systems are closed off or dampered and that the "ventilation tight" status will be religiously maintained after the hatches are closed. (See Westling on Sweat, A Nontechnical Study of Marine Sweating Problems, Vol. II, p. 8.) The Court's finding in California Packing Corp. v. States Marine Corp. of Del., supra, which involved a sweat damage claim, in holding the ocean carrier responsible, pointed out that since the exhaust vents were not sealed there was no effective prevention of air from entering the hold of the ship.

 The ocean carrier is liable if it fails to provide, without excuse, sufficient ventilation or if it is otherwise negligent in handling the cargo. Sweat is regarded as a peril of the sea only when all available and reasonable precautions are taken to avoid it. Wessels v. The Asturias, 2 Cir., 1942, 126 F.2d 999. Therefore, the ship must show freedom from negligence in order to prevail. Gilmore & Black, The Law of Admiralty, § 3–32, p. 140. The burden of explanation is upon the carrier. California Packing Corp. v. The SS P&T VOYAGER, N.D.Calif., 1960, 180 F.Supp. 108. We are convinced that Matson did not take all necessary precautions to prevent sweat damage and that had it done so the damage would not have occurred.

There is no doubt that the shifting of the tractor during the voyage also caused considerable damage to Hunt's cargo. Respondents, Matson and T. Smith, both agree that the stowing of the tractor was improperly done in placing the tractor athwartship rather than fore and aft. However, the evidence conclusively shows that Matson's shipping agent had an experienced cargo supervisor (Krummel) who directly supervised the stowing of all the cargo at New Orleans. When told by the stevedore that the tractor would not fit into the square of the hatch fore and aft, Krummel ordered its stowage athwartship because he said he had orders from the company to load everything on the dock.[3]

We believe the damage done by the tractor's shifting during the voyage was attributable to improper stowage for which Matson is responsible rather than T. Smith, the stevedore. Even though some heavy weather was encountered in the voyage, the shifting and ensuing damage would not have occurred had the tractor been properly stowed. We, therefore, reject Matson's claim over against T. Smith.

The evidence in this case preponderates in libelant's favor rather than Matson's. Accordingly, we have no alternative but to grant an interlocutory decree for all shortage and damage to Hunt's cargo shipped on the HAWAIIAN TOURIST.

An interlocutory decree will be entered in favor of libelant's claim against respondent Matson and rejecting Matson's claim over against T. Smith.

---

3. He said in part: (Record p. 152)
   "Well, Toomey, it's got to go. My orders are to get everything on, and it's got to go on the ship."