**PHILIPP BROTHERS, Division of Engelhard Minerals and Chemicals Corporation, Plaintiff,**

v.

**MV "SABOGAL", her engines, boilers, etc. and Compania Peruana De Vapores S.A., Defendants.**

**No. 77 Civ. 3351–CSH.**

United States District Court,
S. D. New York.

June 3, 1980.

Bigham, Englar, Jones & Houston, New York City, for plaintiff; John E. Cone, New York City, of counsel.

Walker & Corsa, New York City, for defendants; Richard A. Corwin, New York City, of counsel.

## MEMORANDUM OPINION AND ORDER

### HAIGHT, District Judge:

Plaintiff Philipp Brothers brings this admiralty suit against defendant Compania Peruana de Vapores S.A. ("CPV") and its vessel, the M/V SABOGAL, to recover damages allegedly suffered by shipments of bagged wolfram ore during ocean carriage on board the SABOGAL from Matarani, Peru to New York in October-November, 1974. CPV denies any liability. After a bench trial, and consideration of the testimony of the witnesses, the depositions, exhibits, and the presentations of counsel, the Court enters the following Findings of Fact, Discussion, and Conclusions of Law.

### FINDINGS OF FACT

Plaintiff Philipp is a domestic corporation with an office at 299 Park Avenue, New York, N. Y., and is an importer and seller of various ores.

Defendant CPV is a Peruvian corporation, engaged in the common carriage of goods by water for hire, and at the pertinent times owned the M/V SABOGAL, a general cargo and container vessel with five cargo holds.

Plaintiff had a contract with Corparacion Minera de Bolivia ("Comibol"), pursuant to which Comibol supplied wolfram ore to plaintiff from Comibol's Bolsa Negra and Kami mines, located in the interior of Bolivia. The shipments in suit consist of eight lots originally emanating from the Kami mine, and one lot from the Bolsa Negra mine.

It was Philipp's practice to accumulate ore purchased from Comibol at the warehouse facilities at the port of Matarani, Peru owned by Compania de Lanchas, plaintiff's forwarding agent at that port. Lanchas would then load quantities of ore on board designated vessels, as directed by Philipp.

The evidence with respect to the shipments in suit shows that, in accordance with customary practice, the ore was bagged by Comibol at its mines, and sent by truck to the port of Matarani, for warehousing and ultimate loading into a vessel. Plaintiff's agent in Bolivia, Somco Ltd. at La Paz, gave written notice (DXA) to plaintiff's traffic officer in New York that the nine lots ultimately destined for the SABOGAL had been dispatched by trucks from the mines on July 29, 1974 (two lots of 600 bags each); on August 15, 1974 (three lots, one of 437 bags and two of 600 bags each); on September 6, 1974 (one lot of 600 bags); on September 20, 1974 (one lot of 600 bags); and on September 30, 1974 (two lots of 600 bags each). All these lots came from the Kami mine, except the 437-bag lot dispatched on August 15, which originated at the Bolsa Negra mine.

The Lanchas warehouse certificates (DXD, E, F, G) reflect the arrival, in the warehouse at Matarani, of eight of these lots, on the following dates: August 22, 1974 (the two lots shipped from Kami on July 29, and the lot shipped from Bolsa Negra on August 15); on August 29 (one of the two lots shipped from Kami on August 15); on October 15 (the lot shipped from Kami on September 6); on October 10 (the lot shipped from Kami on September 20); and on October 15 (the two lots shipped from Kami on September 30). There is no reference in the warehouse certificates to the second lot shipped from Kami on August 15, but the reasonable inference is that this lot arrived at Matarani on August 29,

together with the second lot with which it had been dispatched from Kami.

The warehouse certificates in evidence (DXD, E, F, G) recite that eight of the lots had reached Matarani in "good overseas shipping condition"; no notation as to the ninth lot appears. There is no evidence in the record to establish the precise meaning of that description, or the inspection undertaken to ascertain the condition.

Plaintiff gave its agent, Lanchas, instructions to load the nine lots in question on CPV's vessel SABOGAL for carriage to New York. The SABOGAL arrived at Matarani on October 16. She discharged a cargo of "milk" (method of packaging not specified) from the five holds. On October 17 at 1720 hours, loading of the wolfram ore commenced in the No. 5 lower hold, and was completed at 1430 on October 18. The SABOGAL, having also loaded coffee in No. 1 hold, departed Matarani at 1740 on October 18.

The SABOGAL's chief mate, Ricardo Romero Bazalar, examined the No. 5 lower hold before the ore was loaded, and found it clean and dry. One of Bazalar's duties was to inspect the condition of the cargo as it was loaded. Damaged bags would be reported to the stevedore's tallyman, and the condition described under the column "Observaciones" on the tally sheets (PX3), as well as posted in the ship's log. Bazalar had no specific recollection of the condition of this cargo. There are no notations of damage on the tally sheets, or in the log (DXU). The mineral itself can spot or stain bags containing wolfram ore; Bazalar would not report that condition, which is normal. If the cargo appears wet on loading, "the bags are transferred and sent to the tallyman, and once again, it is posted in the log, . . . But, if the bag is dry, there is no need to make any comment, any observation." Bazalar deposition at 18, 49; no exceptions are noted to dry bags of ore, *id.* at 41.

Upon loading of the ores at Matarani, CPV's agents issued a series of "clean" bills of lading (PX2), reciting receipt of the goods by CPV "in apparent good order and condition."

The ore was stowed away from the hatch opening, so that had rain fallen through the open hatch it would not have wetted the cargo. In point of fact, this was the dry summer season at Matarani, and no rain fell during loading. Bazalar dep. at 36; DXEE, record of Peruvian National Meteorological and Hydrological Service for September and October, 1974, at Mollendo Station, adjacent to Matarani Bay, showing no rain at all during month of October, and traces only on four days in September.

The bags of ore were stowed one on top of the other, since they were heavy and generally do not move about. This is known as a "block stow," to refer to its creation of a solid, dense block of bags.

On her northbound voyage the SABOGAL called at other ports in Peru and Ecuador to load additional cargo. No rain fell at any of these ports. The first port of discharge in the United States was Philadelphia, where the vessel lay on November 18 and 19.

In contrast to the ports along the western coast of South America where the SABOGAL called on her voyage, rain is known to fall during these months in the Bolivian interior. National Climactic Center weather data (DXAA, BB) contain precipitation reports for 14 Bolivian cities. The trial record does not indicate the location of the Kami and Bolsa Negra mines in relation to these cities, but reference to an atlas shows that the 14 reporting locations cover the length and breadth of Bolivia. During August, 1974 rain fell on at least one day in every city save one (Tarija, in the southernmost part of the country); the other cities experienced rain between 1 and 12 days of the month. In October 13 of the 14 cities reported rain, between 6 and 16 days during the month; there is no report for Charana, a mountain town in the west, on the Chilean border.

At Philadelphia, bags of cocoa were discharged from the No. 5 tween deck at Philadelphia. The cocoa had been loaded at Guayaquil, Ecuador on November 9 and 10.

Plastic sheeting was placed over the ore to prevent it from contaminating the cocoa. No rain fell at Philadelphia during discharge. DXCC.

The SABOGAL next proceeded to New London, Connecticut and thence to New York, arriving at the latter port at 0640 on November 22. During the voyage from Matarani the ship's officers examined each hold every day. No leaks of water through the hatch covers was reported. No water pipes run through the No. 5 tween deck.

In New York the SABOGAL berthed at Pier 1, Port Authority, Brooklyn. Discharging of the wolfram ores in the No. 5 hold commenced at 0750 on November 22, and was completed at 1030 hours on November 23.

■ Philipp arranged for Ledoux & Company, certified public weighers, to weigh and sample the shipments of ore. The Ledoux representative reported to Philipp's traffic manager in New York that, upon inspection, a number of the bags of wolfram ore appeared to be torn or damaged; and that a number of bags were missing entirely. That advice, and the notice of claim given by Philipp to CPV, triggered the attendance, at the discharging pier, of cargo surveyors appointed by both interests: William P. Sullivan of Albert R. Lee & Co, Inc., representing Philipp, and Joseph J. Ledbetter of Peter F. Luard & Co., Inc., representing the vessel interests. Sullivan and Ledbetter surveyed the cargo together on November 27; Ledbetter returned to the scene on December 2, and Sullivan on December 4. Both surveyors testified at the trial.[1] The bags constituting all nine shipments were laid out on pier pallets, about 12–15 bags per pallet. The first condition which caught the surveyor's attention was the fact that an unusually high number of bags were torn, or had their seams open, with the result that the contents were spilling on the pier. Upon closer examination, it was ascertained that the thread with which the bags were sewed together was weak in many areas, easy to pull apart. Upon further examination, it was also observed that many bags showed a washing off of the red exterior markings on the bags. This condition existed in varying degrees, some of the markings being obliterated to a greater extent than others. The bags were dry to the touch; but when the surveyors placed their hands inside the open bags, they observed that the wolfram ore in certain of the bags was moist and damp to the touch. Subsequent analysis indicated that the water with which the ore had come in contact was fresh, not salt.

Other bags had suffered from hook holes and other handling damage; and others had apparently been recoopered prior to discharge.

These several kinds of damage resulted in "slackage," that is to say, a loss of a portion of the bags' original contents. The amount of the loss was calculated by Ledoux & Company, by comparing the weights of sound and damaged bags. This is an accepted means of calculating such a loss.

Of the total number of slack bags, 5% of them had been recoopered; 25% were damaged by hook holes or other handling damage; and 70% had suffered loss as the result of wet ore, weakened threads, and leaking of the contents from the sewn ends of the bags.

1. Plaintiff offered the survey reports of Sullivan and Ledbetter into evidence (PX7, PX10). Defendant objected, on the ground that the witnesses were present in Court to testify, and their written reports were inadmissible as prior consistent statements. That is clearly correct in the case of the report of plaintiff's own surveyor, Sullivan, *Mitchell v. American Export Isbrandtsen Lines*, 430 F.2d 1023 (2d Cir.1970), in the absence of any suggestion by defendant that his testimony was tainted by "recent fabrication or improper influence or motive," Fed.R. Evid. 801(d)(1)(B); *United States v. Quinto*, 582 F.2d 224, 233 (2d Cir.1978). As to Ledbetter's report, plaintiff as an adverse party could have introduced the document if used by the witness to refresh his recollection, Fed.R.Evid. 612, but Ledbetter testified on the basis of his own memory, and plaintiff did not offer the report on that theory. Accordingly defendant's objectives to both survey reports are sustained; they do not constitute a part of the record; and I have not considered their contents. *Cf. United States v. Baxter*, 492 F.2d 150, 165 (2d Cir. 1973).

In addition, the documentary evidence demonstrates an unexplained loss of 12 bags. (Compare bill of lading No. 5, PX2, covering lot K164, consisting of 600 bags, with Ledoux's outturn certificate, PX3, indicating that 588 bags of that lot were discharged from the vessel.)

With respect to the bags containing damp ore, the two surveyors agreed that the condition resulted from an external application of fresh water. Sullivan testified that the condition was "typical of a rain wetting," and must have occurred a "goodly time" before the shipments were examined at New York; his estimate (it was no more than that) was that some of the bags had been subjected to a heavy wetting about 3 to 4 weeks prior to inspection at New York. Ledbetter testified that the wetting must have occurred prior to loading of the ore into the SABOGAL. Both surveyors agreed that the bags themselves were dry to the touch; that the only external signs of wetting were the running or washing off of the markings, more pronounced on some bags than others; and that the damp condition of the ore had rotted and frayed the threads sewing the bags together, causing them to gap open and spill their contents.

I find, on the basis of this testimony and for the reasons amplified in the following Discussion, that the wolfram ore had been subjected to external wetting by fresh water, in all probability rain water, prior to loading on board the SABOGAL. I further find that the ore was not subjected to fresh water wetting while being transported on board the vessel.

Philipp did not acquire title to the wolfram ore by reason of purchasing the bills of lading. The purchase price was paid to Comibol by means of invoices which formed a part of the underlying contractual relationship between those two parties.

The defects in the bags described *ante,* and the 12 bags missing in their entirety, gave rise to a claim for short delivery of the cargo from the SABOGAL, for which Philipp claims damages in the amount of $17,046.38. Evidence as to the quantum of damages was offered at trial, but the parties have not addressed this issue in their post-trial memoranda and proposed findings.

## DISCUSSION

The parties' rights and obligations are governed by the U.S. Carriage of Goods by Sea Act, 46 U.S.C. § 1300 *et seq.* (COGSA). Under COGSA, Philipp as cargo consignee may establish a prima facie case against CPV as carrier by showing that the cargo was delivered in good condition to the carrier but was in damaged condition when discharged. *Nissho-Iwai Co., Ltd. v. N/T Stolt Lion,* 617 F.2d 907 at 912 (2d Cir. 1980).

 In the case at bar, the bags of wolfram ore were concededly delivered at New York in damaged condition. Thus the first element of Philipp's prima facie case is established. Philipp relies upon the clean on-board bills of lading to complete its prima facie case. While a clean bill of lading "is prima facie evidence that the goods were received in good order and condition, such evidence is subject to rebuttal the same as any other." *Fidelis Fisheries, Ltd. v. Thorden,* 142 F.Supp. 798, 799 (S.D.N.Y. 1956); *Horn v. Cia. de Navegacion Fruco, S.A.,* 404 F.2d 422, 435 (5th Cir.1968), *cert. denied,* 394 U.S. 943, 89 S.Ct. 1272, 22 L.Ed.2d 477 (1968); *Caterpillar Overseas, S.A. v. S/S Havtroll,* 333 F.Supp. 783, 785 (S.D.N.Y.1971). The cargo plaintiff "must prove that his goods were in good order and condition when received by the carrier," *Fidelis Fisheries, supra,* at 799;[2] a clean

2. That general rule does not apply when a carrier gives a clean bill of lading for cargo "manifestly damaged" at the time of loading, and suit is thereafter brought by a purchaser of the bill of lading, "who has been misled by the representation and has altered his position to his detriment on the faith of the representation"; in those circumstances the carrier is estopped from proving the actual condition of the goods on loading. *Olivier Straw Goods Corp. v. Osaka Shosen Kaisha,* 27 F.2d 129, 133 (2d Cir. 1928). There is no basis for estoppel in the case at bar, the bills of lading not having been negotiated by anyone to Philipp, and payment for the goods being accomplished through entirely different documents. *Cf. Caterpillar Overseas S.A., supra,* at 785.

bill of lading "gives him a head start in this regard but it is not conclusive," *ibid.* That is particularly true where the condition of packaged goods is not readily visible at loading, a state of affairs illustrated by *Fidelis Fisheries*:

> "Here the caviar was packed in tins which were placed inside canvas bags, which in turn were packed in ice and put into barrels. Obviously, in this case, good order and condition can only apply to the outward appearance of the barrels and not to the condition of the caviar deep inside." *Ibid.*

Thus the Second Circuit has stated generally that "[a] clean bill of lading in the case of packaged goods merely attests to apparent good condition of cargo, based on external inspection." *Vana Trading Co., Inc. v. S/S Mette Skou*, 556 F.2d 100, 103 n.4 (2d Cir. 1977). Where, as in the case at bar, bagged goods are involved, "[t]he recitals of 'apparent good order and condition' in the bills of lading furnished only prima facie proof of the external condition of the bags." *The Niel Maersk*, 91 F.2d 932, 933 (2d Cir.1937) (L. Hand, J.), cert. denied, 302 U.S. 753, 58 S.Ct. 281, 82 L.Ed. 582 (1937).

The carrier's obligation is to note on the bill of lading those conditions indicating damage which "an opportunity for inspection" should have revealed, *Kupfermann v. United States*, 227 F.2d 348, 350 (2d Cir. 1955). The question is whether it is reasonable to assume that, had stains or discolorations observed at the discharging port also existed at the time of loading, the ship's officers would have made notations on the bills of lading. *The Ciano*, 69 F.Supp. 35, 40 (E.D.Pa.1946).

Applying these principles to the case at bar, the clean bills of lading issued by the carrier when the bags of ore were loaded into the SABOGAL speak only of the apparent condition of the bags and not of the ore contained therein. Had any bags been wet when received on board the vessel, it is reasonable to assume that they would have been put aside, called to the tallyman's attention, noted in the tally sheets, entered in the log, and presumably noted in the bill of lading. Chief Officer Bazalar testified that this was the vessel's practice. But the bags of ore were not wet upon loading into the SABOGAL; they were dry. Ledbetter gave his opinion, which I accept, that in view of the block stowage of the bags on board the vessel, so as to prevent ventilation, bags loaded in a wet condition would have remained wet during the voyage, whereas both surveyors agree that at New York the bags were dry to the touch; the damp ore could be felt only through the openings resulting from the rotted threads. Under the cases cited *supra*, the clean bills of lading do not address the condition of the ore within the bags.

The surveyors at New York also observed that the red markings on certain of the bags were "runny" or partially obliterated. No such notations appear on the bills of lading. Philipp argues from that omission that the condition did not exist at the time of loading, and must accordingly be ascribed to some wetting during the voyage. The argument is valid only if one may reasonably assume that the ship's officers would have noted such a condition on the bills of lading. No basis for such an assumption exists. Bazalar's testimony shows that the bags in which wolfram ore is transported are frequently "spotted, stained, because of the mineral itself"; "you almost see this type of stain in all of the shipments"; as a result of such stains, "it appears that some of the mineral itself is coming out." Dep. at 15–16. In the absence of any wet stains or external dampness, no significance arises from the fact that these particular stigmata were not noted in the bills of lading. The evidence establishes the vessel's practice, reasonable enough in the circumstances, of noting stained ore bags only when the stains were accompanied by a wet condition.

It follows that Philipp does not establish a prima facie case by reliance upon the clean bills of lading. Of course, it does not follow that Philipp cannot recover its dam-

ages. COGSA § 3(2), 46 U.S.C.A. § 1303(2), obligated CPV to "properly and carefully load, handle, stow, carry, keep, care for, and discharge the goods carried." Philipp's burden is to prove that any damage to the cargo resulted from a breach of that duty. The failure of the bills of lading to make out a prima facie case simply means that Philipp cannot, on the basis of documents alone, "rely on the difference between the cargo's condition when delivered to Carrier and that at outturn to discharge its burden of proof," *United States v. Lykes Bros. Steamship Co., Inc.*, 511 F.2d 218, 224 (5th Cir.1975). Philipp must go further, and establish that the cargo was delivered to the vessel in good condition, producing "evidence to that effect beyond the bill of lading." *Midwest Nut and Seed Co., Inc. v. SS. GREAT REPUBLIC*, 1979 A.M.C. 379, 384 (S.D.N.Y.1978) (not officially reported). "The burden the shipper is required to meet to prove the actual condition at the time of delivery is considerable." *Ibid.*, citing *Compagnie De Navigation Frassinet & Cyprien Fabre S.A. v. Mondial United Corp.*, 316 F.2d 163, 170 (5th Cir.1963). Where cargo plaintiffs "have not sustained the initial burden of proving the condition of the shipments when made," then "they have not established a cause of action," requiring dismissal of the complaint. *The Niel Maersk, supra*, at 935.

Philipp cannot recover for the loss resulting from wetting and weakening of seams because it has not established the condition of the ore at the time of shipment on board the SABOGAL. We know nothing of the manner in which the bags of ore were shipped from the interior of Bolivia to the Peruvian loading port. In particular, we do not know if the bags were protected from the elements; although we do know that it rains in the Bolivian interior at this time of year, and does not along the coast of Peru. CPV offered into evidence a series of warehouse receipts at Matarani to establish the amount of time required for the overland transportation from the mines. Those receipts, prepared by Philipp's agent, also recite that the shipments were received at Matarani "in good overseas shipping condition." The recitations do not cure plaintiff's failure of proof. Somewhat more impressive certificates, in that they were issued by a presumably independent association, were held insufficient in *The Niel Maersk, supra*.[3]

Even if, contrary to my conclusion, Philipp has proved a prima facie case by means of the clean bills of lading, CPV has rebutted the resulting presumption, of soundness of the goods when received, by its own affirmative proof. That is an effort the ocean carrier is entitled in law to make, *The Ciano, supra*, at 39. Whereas in that case the carrier's proof did no more than establish its inability to account for the damage, a legally insufficient defense, *id.* at 40, CPV has shown in the case at bar, by a preponderance of the evidence, that the bags of ore had been subjected to fresh water wetting prior to loading on board the SABOGAL. That conclusion follows from the length of time of the inland transportation from Bolivia to the Peruvian loading port; the presence of rain inland and its absence on the coast; the convincing evidence that no rain fell during the working of cargo at any port prior to New York; the sheltered position of the cargo's stowage, outside the square of the hatch; the absence of any fresh water pipes in the hold; the fact that the waterweakened bags were scattered throughout the stow (which one would not expect if bags in block stowage had received an external wetting while on board the vessel); and the surveyors' agreement that the external wetting had occurred a considerable time before they observed it. By proving a wettened condition prior to

---

3. "But the certificates of the Exporters Association were surely not competent proof. They were in no way official documents entitled to be received in evidence, and without them there was nothing to show the condition of the fish meal when shipped. The recitals of 'apparent good order and condition' in the bills of lading furnished only prima facie proof of the external condition of the bags. But their external condition would not show whether the contents were potentially subject to decay or had begun to heat up or deteriorate owing to excess of moisture or other causes such as excess of oil." 91 F.2d at 933.

loading, which destroyed the integrity of the bags and led to the spillage complained of, CPV establishes a defense under COGSA, 46 U.S.C. § 1304(2)(m), inherent vice of goods; (n), insufficiency of packing; and (q), other causes arising without the carrier's actual fault or privity.

■ In these circumstances, Philipp cannot recover for the damages resulting from loss through the weakened bags. The claim for loss suffered by apparently recoopered bags also fails. Plaintiff's surveyor Sullivan testified that about 5% of the loss caused by slackage affected bags which had apparently been recoopered prior to discharge from the vessel. His fellow surveyor, Ledbetter, did not notice such a phenomenon. "Recoopering" is the repair of a bag which had parted for some reason. In the circumstances of this case, the most likely cause of any recoopering was the parting of the threads as the result of the pre-existing damp condition of the ore. For the reasons stated, the carrier is not responsible for that condition.

However, the foregoing analysis does not dispose of Philipp's claim for slackage and loss resulting from hook holes, tears, and other physical manifestations of damage to the bags during handling. Both surveyors observed these conditions. They both agreed that such bags constituted 25% of the total of all damaged bags.

These are external conditions of the bags, as to which the clean, on-board bills of lading clearly establish Philipp's prima facie case; and CPV's evidence does nothing to rebut the presumption of good order on delivery to the vessel. Hook holes and tears in the bags would have been observable at the time of loading, and should have been noted; and the carrier's proof does not suggest any cause for such damage apart from handling on board the vessel, prior to delivery.

Accordingly Philipp is entitled to judgment for damages resulting from this kind of damage.

In addition, Philipp is entitled to recover for the unexplained total loss of the 12 bags discussed *ante*.

■ As to damages, the usual measure is the difference between the fair market value of the goods at the port of destination in the condition they were in when shipped, and their value as damaged. *Encyclopaedia Britannica, Inc. v. S.S. Hong Kong Producer*, 422 F.2d 7, 18 (2d Cir.1969), *cert. denied*, 397 U.S. 964, 90 S.Ct. 998, 25 L.Ed.2d 255 (1970). While some evidence of valuation was adduced during the trial, the parties have not dealt with that issue in their post-trial memoranda or proposed findings and conclusions. Presumably the parties can agree upon the amount to be entered in the judgment which will implement this opinion. If they cannot do so, they are directed to submit further proposed findings, conclusions, and memoranda addressing the issue.

## CONCLUSIONS OF LAW

1. The Court has jurisdiction over the parties and the subject matter of this action. 28 U.S.C. § 1333(1).

2. Plaintiff is entitled to recover for loss of its cargo ascribable to hook holes, tears, and other comparable damage to the bags of wolfram ore; and for the value of the 12 missing bags; but is not entitled to recover for damage resulting from the wetting and weakening of the sewn threads and seams of the bags, or for loss from bags which had apparently been recoopered.

The parties are directed, within ten (10) days of the date of this memorandum opinion and order, to submit an agreed judgment in conformity with this opinion, specifying the amount of damages to be contained in the judgment. In so agreeing, neither party will waive its right to appeal from other aspects of the Court's opinion and judgment. Failing such agreement on the quantum of damages, the parties are directed, within ten (10) days of the date of this memorandum opinion and order, to submit further proposed findings of fact, conclusions of law, and memoranda on the question of recoverable damages, again consistent with this opinion.

The judgment eventually entered will provide that each party bear its own trial costs.

It is So Ordered.