**AMSTAR CORPORATION, Plaintiff,**

v.

**M/V ALEXANDROS T., her engines, boilers, tackle, appurtenances and apparel, etc. and Nava Shipping Co., Limited, Defendants.**

**Civ. No. H–76–166.**

United States District Court, D. Maryland.

July 17, 1979.

Donald A. Krach, Robert P. O'Brien and Niles, Barton & Wilmer, Baltimore, Md., Alan S. Loesberg, George F. Chandler, III, and Hill, Rivkins, Carey, Loesberg & O'Brien, New York City, for plaintiff.

Kieron F. Quinn, M. Hamilton Whitman, Jr., and Ober, Grimes & Shriver, Baltimore, Md., for defendants.

ALEXANDER HARVEY, II, District Judge:

The sole question presented in this civil action is the amount of damages due from a shipowner to the owner of a cargo of raw sugar which was delivered in a damaged condition.

Amstar Corporation, the plaintiff (hereinafter "Amstar"), operates a sugar refinery in the City of Baltimore. On January 31, 1976, a shipment of raw sugar arrived at Amstar's Baltimore refinery on board the M/V ALEXANDROS T., a cargo vessel owned by the defendant Nava Shipping Co., Ltd. (hereinafter "Nava"). During the ocean voyage which had preceded the arrival of the vessel in the Port of Baltimore, large amounts of sea water entered all four hatches and damaged the raw sugar. Invoking this Court's admiralty and maritime jurisdiction, Amstar is here seeking damages from the ship and its owner for the losses sustained. The defendants have admitted liability but have contested the award of damages to plaintiff.

Following extensive pretrial proceedings [1] and the entry of a Pretrial Order, the case came on for trial on the issue of damages alone. The trial lasted over a period of some five days, and various expert and other witnesses testified. The evidence pertaining to many of the questions raised was conflicting, and in making its findings, the Court has given due regard to the credibility of the witnesses and the weight their testimony deserves. The Court's findings of fact and conclusions of law, under Rule 52(a) of the Federal Rules of Civil Procedure, are embodied herein, whether or not expressly so characterized.

Plaintiff asserts that it is entitled to recover damages in the amount of $160,944.31, plus interest and costs. Defendants contend (1) that plaintiff has failed to prove any damages at all; (2) that, in the alternative, plaintiff's losses amounted to no more than $5,109.76; and (3) that, as a third alternative, if the Court agrees with plain-

---

1. In a Memorandum and Order dated May 2, 1977, this Court denied defendants' motion to dismiss the complaint. *Amstar Corporation v. M/V ALEXANDROS T.*, 431 F.Supp. 328 (D.Md.1977).

tiff's methodology for computing damages, plaintiff would be entitled to recover merely $34,897.20.[2]

I

### The facts

Many of the background facts have been stipulated. The M/V ALEXANDROS T. is a motor vessel registered in Cyprus and owned by the defendant Nava Shipping Co., Ltd., a Cypriot corporation with offices in Nicosia, Cyprus. At all times pertinent to this action, the vessel was being operated under a time charter between Nava and Eastern Mediterranean Maritime Limited. On December 17, 1975, the time charterer entered into a bulk sugar charter with Westway Trading Corporation of New Jersey (hereinafter "Westway") for the carriage of a cargo of approximately 4,000 long tons of raw sugar from Nicaragua to any one of several designated ports in the United States, including Baltimore. The next day, plaintiff Amstar contracted to purchase from Westway 4,000 long tons of sugar to be shipped on the ALEXANDROS T.

Pursuant to the bulk sugar charter, the ALEXANDROS T. took on a bulk cargo of raw sugar in the port of Corinto, Nicaragua. The cargo was loaded in good order and condition, loading having been completed on January 15, 1976, and clean bills of lading were then issued. On January 23, 1976, Amstar designated Baltimore as the port of discharge for the sugar it had purchased from Westway. When the vessel arrived at Baltimore Anchorage on January 29, 1976, Amstar was the owner of the cargo of sugar.

On January 31, 1976, a Saturday, the ALEXANDROS T. proceeded to the Amstar pier in Baltimore and docked at about

7:00 A.M. that day. Shortly thereafter, hatches Nos. 1 and 3 were opened and discharge of the raw sugar commenced. The Amstar facility in Baltimore discharges bulk sugar by the use of two gantry cranes which lower large clamshell grabs into the holds of ships which dock at the Amstar pier. Each lift of a grab removes approximately 14,000 pounds of sugar. The grab drops the raw sugar into hoppers on the pier, and the hoppers in turn feed conveyor belts which carry the sugar up to and through the scalehouse and ultimately into the raw sugar warehouse. The raw sugar is carried on conveyor belts along the pier and then into the scalehouse, which consists of three hoppers, one beneath the other.

As the sugar is unloaded, it is necessary that it be weighed and sampled so that the proper price can be established for a particular shipment. Sampling at Amstar's facility is ordinarily accomplished by an automatic sugar sampling device, which is a part of the bottom or discharge hopper and which includes a constantly rotating auger, three inches in diameter.[3] Rotating at a constant speed, the auger is designed to take out continuous samples of the raw sugar passing through the bottom hopper and to deposit the sampled sugar into cans which have a 35-pound capacity. Sugar from the sample cans is then mixed and placed in 8-ounce jars, which are subsequently delivered to various laboratories for testing.

Henry Kief is manager of the Raw Sugar and Customs Department of Amstar's Baltimore facility. Shortly after 7:15 A.M. on January 31, 1976, Kief arrived at the pier, went aboard the ALEXANDROS T. and observed that salt water had wetted the sugar in the two hatches then open. Kief requested that the remaining two hatches be opened, and he observed wet raw sugar

---

**2.** In its pretrial memorandum, defendants contended for the first time that plaintiff lacked standing to sue because there had been no proper showing of subrogation. This defense was not asserted in the Pretrial Order and accordingly has not been preserved. In any event, there is no merit to the contention under the facts of this case.

**3.** As discussed more fully hereinafter, the automatic sampling device is not used for the sampling of a cargo of raw sugar which has been damaged by sea water. The device furnishes a representative sample of dry sugar but not of wet sugar.

in hatches Nos. 2 and 4 as well. Each hatch held approximately 2,200,000 pounds of raw sugar. At 8:45 A.M., the discharge of the cargo was halted because Kief had concluded that the sugar was more damaged than he had first supposed. Kief then telephoned Mr. Richard Tierney, his superior in New York, who, among other things, ordered that a marine surveyor be engaged to make a proper determination of the cause and extent of the damage.

While on the scene, Kief consulted with Thomas Augulis of R. Markey & Sons, Inc. (hereinafter "Markey"), an independent sugar sampling firm, which had been engaged by Westway to sample the cargo. Kief and Augulis agreed that it would not be possible to segregate the wet sugar from the dry, and they decided that the cargo would have to be discharged with the wet and the dry sugar commingled. Kief and Augulis also concluded that the automatic sampler would not give reliable readings because of the large amount of wet sugar which would be passing through the bottom hopper. Accordingly, it was decided that Kief should take hand samples from each of the four hatches and that these hand samples would be used instead of the automatic sampling device for computing the price at which the sugar would be sold.

Unloading operations were accordingly resumed and continued throughout the day. During the unloading, Kief went into each of the four hatches and, using a small scoop, filled eight separate 35-pound cans with samples of raw sugar. Four of the cans were filled with wet, damaged sugar, and four of the cans were filled with dry, undamaged sugar. Sugar from these cans was then mixed, placed in jars and sent to various laboratories for testing. The resulting tests were used for determining the price paid by Amstar to Westway for the sugar it received and are also relied upon here by Amstar in calculating its damages.

At approximately 9:00 A.M. on January 31, 1976, Ramsay, Scarlett & Co., agents for the time charterers, had contacted a Balti-

more law firm, which was the local representative of West of England Shipowners Mutual Insurance Association Limited, the liability insurer of the vessel. The request was made that a representative of the law firm make an immediate investigation aboard the ALEXANDROS T. with regard to a possible claim for cargo damage. At approximately 9:30 A.M., an attorney from that law firm engaged marine surveyor Sumner R. Dolber, of Edward F. Carter & Associates, to assist in the investigation. One half-hour later, the attorney and Dolber arrived at the ship and commenced their investigation. The attorney primarily interviewed the ship's master, Captain P. Daskalakis, and Dolber observed the discharge of the sugar, which by that time had been started up again and was continuing.

At approximately 11:15 A.M., Paul Trapani, a marine surveyor from Baltimore Cargo Surveyors who had been engaged by Amstar, arrived at the ship to begin his survey. He proceeded to the office of the ship's master, where he found the ship's attorney and Dolber. Trapani began his survey by inquiring into the cause and extent of the cargo loss but was then asked to leave the ship by the attorney. Trapani complied and left the ship. However, Kief remained on board and continued to supervise the unloading operations and to take samples of the damaged and sound sugar. Discharge was completed by 6:15 P.M., and the ship then left the Amstar pier and proceeded to anchorage in the Baltimore harbor. On Monday, February 2, 1976, this civil action was filed, and the ALEXANDROS T. was arrested by the United States Marshal.[4]

## II

### The applicable principles of law

In a cargo damage case, the primary objective in awarding damages is to indemnify the plaintiff for the loss sustained by reason of the carrier's fault. *Interstate Steel Corp. v. SS CRYSTAL GEM*, 317

---

4. A detailing of the facts pertaining to the arrest and subsequent release of the vessel is set forth in the Court's earlier opinion in this case. *See* 431 F.Supp. at 330–331.

F.Supp. 112, 121 (S.D.N.Y.1970); Wood, *Damages in Cargo Cases*, 45 Tul.L.R. 932, 942 (1971). The plaintiff, of course, bears the burden of proving the fact of damages and also the quantum of damages. *Interstate Steel Corp. v. SS CRYSTAL GEM, supra; O'Brien Bros., Inc. v. THE HELEN B. MORAN*, 160 F.2d 502, 504–05 (2d Cir. 1947).

■ In a case involving damaged cargo, the measure of damages is the fair market value at the port of destination of the goods in a sound condition less the fair market value of the goods in their damaged condition. *Elia Salzman Tobacco Co. v. THE SS MORMACWIND*, 371 F.2d 537 (2d Cir. 1967); *Holden v. SS KENDALL FISH*, 262 F.Supp. 862 (E.D.La.1966), aff'd 395 F.2d 910 (5th Cir. 1968); Wood, *Damages in Cargo Cases*, 45 Tul.L.R. 932 (1971). If goods are to be added to the stock of the owner, the term "market value" means the wholesale or bulk price. *National Distillers Products Corp. v. Companhia Nacional de Navegacao*, 107 F.Supp. 65, 70 (E.D.Pa.1952). For commodities such as sugar or grain, the simplest proof of damages consists of published market listings at the port of destination. Wood, *Damages in Cargo Cases*, 45 Tul.L.R. 932, 937 (1971).

### III

*The fact of damage*

Defendants first contend that plaintiff has failed to prove any damages at all. Such an argument amounts to the contention that the commercial value of a cargo of raw sugar is in no way diminished when large quantities of salt water come into contact with the sugar during an ocean voyage. To state the proposition is to demonstrate its inherent weakness.

■ In a case such as this one where liability has been established, the precise amount of the damages to be awarded need

not be shown with mathematical certainty. *Association of Maryland Pilots v. Baltimore & Ohio RR Co.*, 304 F.Supp. 548 (D.Md. 1969); McCormick, *Damages*, § 27. Although damages may not be based on speculation or conjecture, a plaintiff need do no more than present sufficient evidence from which damages can be determined on a rational basis. *Nisshin Fire & Marine Insurance Co., Ltd. v. MV WASHINGTON MAIL*, 573 F.2d 1315 (9th Cir. 1978).

■ In this case, there can be little doubt that large quantities of sea water entered all four of the ship's hatches and damaged the raw sugar. The hatch covers of this 19-year old vessel were rusted and in a deteriorated condition, permitting salt water to penetrate and thoroughly saturate the vessel's cargo during the ocean voyage from Corinto, Nicaragua to Baltimore, Maryland. Indeed, defendants have conceded liability in this case.

Moreover, the testimony of Amstar's employee Kief and Markey's employee Augulis, both of whom were present during the unloading operation on the morning of January 31, establishes the extent of the damage. Kief, who was on the scene all day[5] and who actually entered and did sampling work in all of the hatches, found salt water in every one of them, with hatch No. 3 being the worst. In No. 4, the saturation extended all the way to the bottom of the hatch, and Kief found himself knee-deep in syrup when most of the cargo had been removed from that hatch. In hatch No. 3, he constructed a three-foot-high dam to prevent the water from saturating other parts of the cargo, but the dam finally broke during the unloading. Kief, who was in the best position of any witness to make such an estimation, concluded that 50% of the entire cargo had been damaged by sea water.[6] Following discharge of the entire cargo, large amounts of water and syrup remained in hatch No. 3 and approximately 100 gallons of sea water in hatch No. 4.

---

**5.** Kief was on the scene for approximately twelve hours on January 31, 1976, or until 7:00 P.M.

**6.** Kief concluded that one-third of the sugar in each of hatches Nos. 1, 2 and 4 was contaminated by salt water and that 100% of the sugar in hatch No. 3 was so damaged. Full credit will be given to his testimony in this regard.

Augulis was also on board the vessel during a good part of the day of the discharge. He did not enter the hatches but observed them from the deck, and his testimony confirms that of Kief. Augulis described streaks in the raw sugar caused by the water, and testified that in various places the water lay in puddles like a pool. According to Augulis, salt water breaks down the grain of raw sugar, making it deteriorate and turn into a liquid like a syrup. In the report he rendered to his employer, he stated that the cargo was "inundated with sea water." In his opinion, 60% of the cargo had been damaged by the sea water.

Full credit will be given to the testimony of both Kief and Augulis in this case. They were on the scene and the observations of each confirm those of the other. On the record here, this Court finds and concludes that plaintiff has clearly met its burden of proving that it in fact sustained damage to the raw sugar it owned as the result of the admitted fault of the defendants.

## IV

### The quantum of damages

#### (a) Expenses of handling and testing

█ Having proved the fact of damage, plaintiff is undoubtedly entitled to recover additional expenses caused by the handling and testing of the damaged cargo. Because damaged cargo was involved, additional stevedoring costs were incurred as were extra weighing and sampling costs, amounting to $5,109.76. Defendants concede that if this Court finds that plaintiff has met its burden of proving the fact of damage, this amount is properly a part of the judgment to be entered.

#### (b) Loss of value of the damaged sugar

The principal contest in this case arises because of the manner in which plaintiff has calculated the fair market value of the damaged sugar. Using the commercial spot price for raw sugar, Amstar has calculated its damages by subtracting the market value per pound of the damaged sugar from the market value per pound of the sound sugar and then multiplying the difference by the amount of damaged sugar it received. Using these figures, Amstar calculates this part of its loss at $155,834.55. Amstar paid Westway $1,345,077.00 for the cargo and is thus here claiming that the loss it suffered because it received damaged instead of sound sugar amounted to approximately 11.6% of the cost of the entire shipment. For an understanding of the methodology employed by plaintiff for calculating its damages, some discussion of raw sugar and its properties is necessary.

In its raw state, sugar consists of sucrose, invert sugars and non-sugar solids. When a refinery like Amstar purchases raw sugar, it is interested in the sucrose it is buying and not in any of the other elements. The refining process separates the sucrose from the non-sucrose elements of raw sugar and then uses the sucrose to turn out refined sugar products. Accordingly, the price of raw sugar is determined by the percentage of sucrose it contains. The term "polarity" refers to the percent of sucrose present in raw sugar. The higher the polarity, the greater the percent of sucrose.

The central market for trading in raw sugar in the United States is the New York Coffee and Sugar Exchange, located in New York City. Raw sugar is traded on the Exchange on the basis of its polarity and is bought and sold on the Exchange at a standard 96° polarity (or 96% sucrose content). However, bulk sugar in its raw state may vary up or down from a polarity of 96°. Therefore, in determining the value of a cargo of raw sugar, its polarity must first be determined, and the spot price for a particular day is then adjusted either up or down, depending upon the polarity of the particular shipment of raw sugar.

In view of the importance of polarity in determining the price of a shipment of raw sugar, it is necessary that each shipment be weighed, sampled and tested. Formerly, hand sampling was used for this purpose, but in recent years, Amstar has had an automatic sampling device included as a part of its unloading machinery and equipment.

Amstar paid Westway for this shipment of raw sugar in accordance with the customary industry practice. The contract price was to be adjusted depending upon the actual weight and polarity of the cargo, pursuant to a commercially accepted formula. The spot price for Friday, January 30, 1976 (which was the last trading day of the Coffee and Sugar Exchange before delivery on Saturday, January 31, 1976) was 14.90¢ per pound. Under the contract between Amstar and Westway, any risk of loss had to be assumed by Amstar once the sugar was loaded on the ALEXANDROS T. in sound condition. Therefore, Amstar was required to pay Westway on the basis of having received undamaged sugar. 8,825,-378 pounds of raw sugar were actually discharged on January 31, 1976. The polarity of the sound sugar was calculated at 97.-790863°. Inasmuch as this polarity was in excess of the standard 96°, Amstar paid Westway 15.27¢ per pound for the entire shipment, a price computed pursuant to the formula used by buyers and sellers of raw sugar under such circumstances.

By means of hand sampling, the polarity of the damaged sugar was determined to be 91.097742°, resulting in a market value on the day in question of 11.97¢ per pound, pursuant to a similar formula. Having ascertained that 50% of the entire cargo was contaminated with sea water, Amstar has calculated its damages at $155,834.55.

■ On the record here, this Court finds and concludes that the loss suffered by Amstar because of sea water damage to the raw sugar it received on January 31, 1976 amounted to $145,772.30. The evidence in this case fully supports the methodology for computing damages endorsed by plaintiff's witnesses. However, plaintiff is not entitled to the full sum of $155,834.55 which it has claimed, because this figure is based on the insured value per pound. In a case such as this one, damages must be measured in terms of the economic loss to the plaintiff, not by what may have been paid to the plaintiff under an insurance contract. *See Weirton Steel Co. v. Isbrandtsen-Moller Co.,* 126 F.2d 593 (2d Cir. 1942). When the loss

here is computed in terms of the market value per pound, Amstar's damages for this portion of its loss amount to $145,772.30.

This Court will apply in this case the traditional method for measuring damages in a cargo damage case, namely the fair market value of the goods in a sound condition at the port of destination less the fair market value of the goods in their damaged condition. *Holden v. SS KENDALL FISH, supra* at 864. That test is particularly appropriate here where a commodity like raw sugar is involved. Not only is raw sugar traded daily on an open exchange, but also the industry recognizes an accepted commercial practice for determining the quality of a shipment in terms of the percentage of sucrose it contains. Merchants regularly buying and selling raw sugar in bulk accept 96° as the standard polarity and adjust the daily spot price up or down in accordance with a commercially accepted formula based on the results of commercially approved sampling procedures.

■ It is undoubtedly true, as defendants assert, that Nava is not "bound" by provisions of the contract between Amstar and Westway nor by any agreement between Amstar and its insurer concerning the appropriate manner for determining the amount of a loss. However, the evidence in question is indeed relevant for the purpose of showing the commercially accepted practice in the sugar industry for determining the market value of a large quantity of raw sugar. The fact that the industry's accepted commercial practices are recognized by the seller of this sugar and by the cargo underwriter (as well as by others who are regularly involved in the buying and selling of sugar in bulk) hardly makes the evidence inadmissible or irrelevant.

■ The total weight of this cargo on discharge from the ALEXANDROS T. was 8,825,378 pounds. This Court finds that one-half of the cargo was damaged by sea water, or 4,412,689 pounds. The polarity of the sound sugar was determined by commercially approved sampling and testing procedures to be 97.790863°, while the polarity of the damaged sugar was similarly

found to be 91.097742°. On the last business day before the loss, the spot price for raw sugar with a polarity of 96° was 14.90¢ per pound. If one applies to this spot price commercially accepted procedures for computing the cost of sugar with a greater polarity than 96° and also for computing the cost of sugar with a lesser polarity than 96°, the cost of the sound sugar in this case comes to 15.270798¢ per pound and the cost of the damaged sugar comes to 11.967318¢ per pound. The fair market value of the entire cargo of sugar in a sound condition at Baltimore on January 31, 1976 thus amounts to $1,347,705.65.[7] Similarly, the fair market value of the entire cargo of sugar in a damaged condition amounts to $1,201,933.35.[8] The difference is $145,772.30,[9] which this Court will award to the plaintiff as a part of its damages in this case.[10]

### (c) Defendants' contentions

Defendants present a number of different arguments in support of their contention that plaintiff's methodology and calculations should be rejected by this Court. First, it is argued that plaintiff's figures should not be accepted because they are based on polarity determinations which were made following receipt by the laboratories of samples of this cargo taken by hand. Ordinarily, when a damaged cargo of sugar arrives at Amstar's Baltimore facility, the automatic sampling device is turned off. By oversight, this did not occur during the hectic morning hours of Saturday, January 31, 1976. Samples of commingled damaged and sound sugar passing through Amstar's discharge hopper were therefore taken by the automatic sampling device. These samples disclosed essentially no decrease in the polarity of the entire shipment of sugar from that shown by the hand sampling of the sound sugar alone. Relying on tests of these samples, defendants accordingly argue that Amstar has suffered no loss at all because the polarity of the commingled damaged and sound sugar it received was the same as the polarity of the sound sugar alone.

Thus, a key issue presented in this case is whether hand sampling or automatic sampling was the appropriate means for determining the extent of the loss under all the circumstances here. Quite obviously, some sampling of the 8.8 million pounds of raw sugar was necessary before any calculation of the extent and quantum of damages could be made. An estimation of damages extrapolated from a sampling of the cargo has been recognized as an appropriate and practical means for determining the amount of an award. *Compagnie de Navigation, etc. v. Mondial United Corp.,* 316 F.2d 163, 171 (5th Cir. 1963). So long as a reasonably representative sample has been taken and so long as the sample is sufficient to indicate fairly the quality, condition and nature of damage to the whole cargo, a sampling method will be upheld as a reasonable basis for projecting damages. *Id.* at 170–171; *Interstate Steel Corp. v. SS CRYSTAL GEM, supra* at 117–118.

On the record here, this Court finds and concludes that Amstar's automatic sampling device was not a reliable means for the sampling of this cargo of damaged raw sugar, one-half of which was saturated by sea water. The polarity readings which resulted from the testing of samples taken by the automatic device will therefore be rejected. This Court further finds and con-

---

**7.** 8,825,378 pounds × 15.270798¢ = $1,347,705.65.

**8.** 4,412,689 pounds × 15.270798¢ = $673,852.82; 4,412,689 pounds × 11.967318¢ = $528,080.53; and $673,852.82 plus $528,080.50 = $1,201,933.35.

**9.** $1,347,705.65 – $1,201,933.35 = $145,772.30. This computation comes within a penny of plaintiff's Exhibit No. 18–B.

**10.** The testimony and exhibits introduced at the trial by Amstar computed the loss in a slightly different manner. However, the result is precisely the same. In Amstar's computations, the damaged value per pound was subtracted from the sound value per pound, yielding a difference of 3.30348¢ per pound. Multiplying the amount of damaged sugar by that figure yields the same total loss of $145,772.30 (4,412,689 pounds × 3.30348¢ = $145,772.30).

cludes that the hand sampling method employed by Kief and approved by Augulis was reasonable and appropriate under all the circumstances of this case for determining the quantum of this loss.

In making these findings, the Court has given full credit to the testimony of both Kief and Augulis, as supported by that of Tierney. Kief had been in the sugar business for thirty years and had been manager of Amstar's raw sugar department for ten years. He had supervised the unloading of countless numbers of cargoes of raw sugar, including damaged as well as sound cargoes. Augulis was employed by R. Markey & Sons, Inc., a certified public sampler, and had been in the sugar business for twenty years.[11] He likewise had been present on numerous occasions when cargoes of both sound and damaged sugar had been unloaded. Both Kief and Augulis testified that Amstar's automatic sampler would not provide accurate polarity readings when saturated raw sugar of this sort passed through the discharge hopper. Kief explained why. With sea water splashing around as the damaged sugar passed along the conveyor belt and into the hoppers, the automatic sampler would not produce a representative sample. Wet sugar, which is heavier than the dry, hits and falls down alongside the baffle plate, while the dry sugar spreads out and goes into the automatic sampler. Kief stated that the sugar in the automatic device was never meant to be used for the sampling of wet or magma-type[12] sugar such as this damaged cargo. Augulis also testified that hand sampling was always used for damaged cargoes of this sort.

Defendants next argue that the sampling procedures employed by Kief were insufficient, both as to manner and extent, to provide representative samples and there-

fore may not be relied upon in determining damages in this case. Defendants contend that any calculation of damages based on Kief's hand sampling of the sugar is not based on sufficiently precise data and accordingly amounts to an award based on speculation and conjecture.

■ Whatever the result might be under other circumstances, these arguments are particularly inapplicable here. Any lack of precision in the calculation of damages in this case was substantially caused by actions of representatives of defendants. Even before the ship docked at Amstar's pier, the master of the ALEXANDROS T. was aware that the cargo had been damaged by sea water during the ocean voyage from Nicaragua to Baltimore.[13] Yet, unaccountably, no advance notice whatsoever was given to Amstar, which had gone forward with preparations for the unloading of a sound cargo of sugar. Only when all four hatches had been opened on Saturday morning, January 31, was Amstar for the first time aware of the fact that the entire cargo was thoroughly saturated with salt water. By then, unloading operations were well under way, and wet and dry sugar had already been commingled.

Equally unreasonable was the action of defendants' attorney in ordering plaintiff's surveyor Trapani off the ship shortly before noon. Defendants' surveyor Dolber was already on board, and the normal procedure would have been for both surveyors to make joint observations so that the loss might be readily computed and adjusted. This is not to say that there is any legal duty on the part of a shipowner to undertake a joint survey together with a representative of the owner of the damaged goods.[14] But the hard-nosed, defensive atti-

---

11. Augulis, who had no stake in the outcome of this litigation, originally estimated even more damage than did Kief. He concluded that 60% of the cargo was damaged, as opposed to Kief's 50%. Eventually, both Kief and Augulis agreed that the proper figure was 50% damaged cargo and 50% sound cargo.

12. A mixture of sugar crystals and syrup is often referred to as "magma".

13. As early as January 29, 1976, Captain Daskalakis knew that sea water had entered the cargo hatches and damaged the raw sugar.

14. Although not conclusive in establishing the pertinent facts, a joint survey has "the benefit of mutual observation * * *." *Nissho-Iwai Co., Ltd. v. Star Bulk Shipping Co.*, 503 F.2d 596, 598 (9th Cir. 1974). Thus, inspections of damage made outside the presence of a repre-

tude assumed by the defendants' attorney on the day of the unloading certainly has the effect of undercutting defendants' contention at the trial that plaintiff's sampling procedures were insufficient to sustain the burden of proving the amount and extent of its damages.[15]

What Kief did under all the circumstances here was entirely justified. He might have refused to accept delivery of the damaged cargo. Or he might have halted unloading operations in an effort to reach some agreement with representatives of the ship concerning the proper means for determining the nature and extent of the cargo damage. But any such a course of action would involve delay in the unloading process and might be construed as a failure on the part of Amstar to minimize damages. A shipper suffering cargo damage has a duty to minimize its damages and is barred from recovering damages which might have been avoided by reasonable effort. *Compagnie de Navigation, etc. v. Mondial United Corp., supra* at 171; *United States v. THE HOLLAND*, 164 F.Supp. 741, 745 (D.Md.1958). The longer the sea water remained in the hatches, the more raw sugar it might be expected to impregnate. Moreover, additional labor and demurrage charges would be incurred if the vessel was not promptly unloaded.

Kief accordingly ordered the discharge operations to continue, and unloading was thus completed that same day, by 6:15 P.M. Since the automatic sampling device was not reliable for the sampling of a cargo of contaminated raw sugar such as this one, there was no other way to measure polarity except by hand sampling. Under the watchful eye of Augulis, Kief himself entered each of the hatches, moved back and forth into all four corners of the hatches and took representative hand samples of both sound and damaged raw sugar. He carefully and conscientiously used a small scoop to take samples from many different locations in each hatch. Any argument that Kief should have spent more time and taken more samples from different parts of the cargo amounts to no more than 20–20 hindsight. Kief was operating under extreme pressure at the time, with knowledge that there was no surveyor on board representing his employer [16] and that it would be prudent to complete unloading operations as soon as possible.

To allow a tort feasor like Nava "to avoid paying damages because such damages were to some extent imperfectly established would be unjust and unbearable." *Daniels Towing Service, Inc. v. Nat Harrison Associates, Inc.,* 432 F.2d 103, 106 (5th Cir. 1970); *see F. J. Walker, Ltd. v. Motor Vessel "LEMONCORE",* 561 F.2d 1138, 1147 (5th Cir. 1977). This principle applies with particular force in this case in which the tort feasor itself has blocked efforts to conduct a joint survey of the damages. As the Court observed in *Empresa Central Mercantil de Representacoes Ltda. v. Republic of the United States of Brazil,* 257 F.2d 747, 749 (2d Cir. 1958):

> Moreover, Lloyd, although requested to do so, refrained from participating in the survey. Under the circumstances, we do not think it can complain because Empresa did not adduce the highest character of proof. *Cf. The Rosalia,* 2 Cir. 1920, 264 F. 285, 290.

For the rendering of a verdict in a case such as this one, no more than a just and

---

sentative of the opposing party "have been frowned upon by courts of Admiralty and they are accorded diminished weight." *Frederick Snare Corp. v. Moran Towing & Transp. Co.,* 195 F.Supp. 639, 642 (S.D.N.Y.1961). In this case, considerable weight has been given to the inspections made by Kief because they were confirmed by Augulis, a representative of a non-party.

15. Defendants' witnesses admitted that the customary method of measuring damages in a case of this sort is by way of a joint survey.

Moreover, counsel for defendants conceded in final argument that a mistake may have been made when plaintiff's surveyor Trapani was ordered off the ship.

16. During his testimony, Kief succinctly described what went through his mind when he learned that Amstar's surveyor had been ordered off the vessel, as follows: "He's [the shipowner's] got a surveyor; I have no surveyor. I have to do everything myself now."

reasonable estimate of the damages based on relevant data need be made. *Daniels Towing Service, Inc. v. Nat Harrison Associates, Inc., supra* at 106. Under the facts here, this Court finds and concludes that the hand sampling procedures employed by Kief were reasonable and that the samples taken by him were sufficient to indicate fairly the quality, condition and nature of the damage to the entire cargo.

 Finally, defendants contend that the market value test is inapplicable in this case because the plaintiff has failed to show that Amstar has sustained any actual economic loss. This Court would disagree. The evidence produced is sufficient to establish that one-half of the entire cargo was in a damaged condition and that the polarity of the damaged raw sugar was approximately 91.1°. As to that sugar, Amstar in its refining process sustained a clear loss, since the sucrose was below the 97.8° polarity which Amstar had paid for the entire cargo. As explained by the witness Robinson, who was a chemical engineer and Process Manager of Amstar's Baltimore facility, there is less sucrose in wet sugar, and a decrease in the polarity of sugar indicates that there has been a chemical change resulting from the wetting. Thus, Amstar received and eventually sold considerably less sucrose than it would have received and sold had the entire cargo been sound. Furthermore, as the polarity of raw sugar decreases, the costs of refining increase. Indeed, Amstar undertook to refine this cargo of sugar as rapidly as possible to minimize the continuing adverse chemical reaction and its resulting loss. Clearly then, Amstar suffered an economic loss when it refined and sold the damaged sugar in question. This Court is satisfied that the market value test is the appropriate standard for measuring this economic loss.

Defendants rely principally on the testimony of Dr. James Chen, a chemist. Dr. Chen's after-the-fact study of what occurred on January 31, 1976 and his analysis of the chemical properties of raw sugar led him to the surprising conclusion that Amstar either suffered no loss at all when sea water contaminated 4 million pounds of the raw sugar it received that day or that such loss was negligible. No weight will be given to the opinions and calculations of this witness. Dr. Chen was not present on January 31, 1976 when this cargo was unloaded, as were the witnesses Kief and Augulis, nor did he have the day-to-day knowledge of the operation of Amstar's facility possessed by the witnesses Kief, Robinson and Augulis. Furthermore, Dr. Chen did not have the practical experience in commercial operations possessed by plaintiff's witnesses, many of whom were engaged in the buying and selling of bulk sugar on a daily basis. The damages assessed by this Court are based on the value of the goods as shown by their actual market value, not on what that value should have been under formulae devised by a university professor. As opposed to the practical opinions of Kief and Augulis which were based on commercial experience, personal knowledge of Amstar's discharge facilities and actual observations on January 31, 1976, Dr. Chen's calculations and conclusions were theoretical in the extreme and will be rejected by this Court.[17]

V

*Conclusion*

For the reasons stated, plaintiff is entitled to an award in this case of $5,109.76, representing additional expenses incurred, and $145,772.30, representing the loss of value of the damaged sugar, or a total of $150,882.06. This Court will also award plaintiff pre-judgment interest, in the amount of 6% from January 31, 1976 to the date of this judgment, plus costs.[18] The

17. The testimony of the other expert witnesses called by the defendants was for similar reasons unpersuasive and will likewise be given no weight.

18. Allowance of interest in a case of this sort is the general rule, and interest should be disallowed only in the face of exceptional circum-

stances. *O'Donnell Transp. Co. v. City of New York,* 215 F.2d 92, 95 (2d Cir. 1954); *Iligan International Corp. v. SS JOHN WEYERHAEUSER,* 372 F.Supp. 859, 869 (S.D.N.Y. 1974); *Interstate Steel Corp. v. SS CRYSTAL GEM, supra* at 122–124. There are no exceptional circumstances in this case which would support the disallowance of pre-judgment interest.

Clerk is directed to enter judgment accordingly.