**BRUZZONE CONSOLIDATION, INC., et al.**

v.

**M/V BLUE EAGLE, her engines, boilers, etc., et al.**

**Civ. No. PN–85–4530.**

United States District Court, D. Maryland.

May 1, 1989.

James W. Bartlett, III, Wilson, Elser, Moskowitz, Edelman & Dicker, Baltimore, Md., and M.E. DeOrchis, DeOrchis & Partners, New York City, for plaintiffs.

David W. Skeen, Wright, Constable & Skeen, Baltimore, Md., and James M. Kenny, Leonard, Kenny & Stearns, New York City, for defendant Maher Terminals, Inc.

Steven E. Leder, Lord & Whip, P.A., Baltimore, Md., for defendant Terminal Corp.

William R. Dorsey, III, Semmes, Bowen & Semmes, Baltimore, Md., for defendants Otranto Enterprises, Ltd. and Blue Flag Navigation, Ltd.

## OPINION

NIEMEYER, District Judge.

This case presents questions relating to the proper method for quantifying a cargo loss in admiralty.

During the week of August 20, 1984, the M/V BLUE EAGLE was unloaded by the defendant Maher Terminals, Inc. at the Clinton Street terminal in Baltimore. The cargo, which consisted of some 6,000 rolls of high quality paper, was damaged during the unloading process, and plaintiffs have sued for damages.

The case was tried in admiralty for six days on November 21–23, 1988, and January 9–11, 1989. Following closing arguments, on January 11, 1989, the Court made findings of fact and rulings of law on liability. The Court concluded that the defendant Maher Terminals was negligent. Finding also that the cargo had been in good condition at the beginning of the unloading operation, the Court dismissed the vessel owner. Finally, it dismissed the claims against the terminal warehouse operator because of a failure of proof. Although there were suggestions that perhaps six or seven rolls had been damaged while in the warehouse, there was no further evidence to suggest whether those rolls were part of the cargo that was the subject of the litigation. Maher Terminals therefore remains the only defendant.

The Court invited the parties to file proposed findings of fact and conclusions of law on the issue of damages, which have been submitted by the parties and fully considered. This opinion will serve as the findings of fact and conclusions of law on damages, pursuant to Rule 52(a), Fed.R. Civ.P.

## I

The M/V BLUE EAGLE took on 3,765 rolls of paper at Naples, Italy, and an additional 2,431 rolls of paper at Arbatax, Sardinia. The total load of 6,196 rolls of paper, plus 41 pallets of flat paper, made up the entire cargo of the M/V BLUE EAGLE. The shippers of the cargo were Car-

tiere Reunite Donzelli E. Meridionali S.p.A. (CRDM) and Cartiere Italiane Reunite (CIR), who were the Italian papermills which manufactured the paper. They retained Bruzzone Consolidation, Inc. to make all arrangements for the shipment of the paper to Baltimore and beyond. Bruzzone was the consignee on all of the bills of lading and was also the charterer of the M/V BLUE EAGLE. Bruzzone engaged the defendant Maher Terminals to unload the vessel in Baltimore and transport the cargo from the pier into a nearby warehouse.

The unloading of the M/V BLUE EAGLE began on Monday morning, August 20, 1984, and was completed on Friday, August 24, 1984. While the vessel was being unloaded with specially designed clamps for lifting paper rolls, known as Jensen Gear, rolls of paper fell from the clamps onto the pier, onto other rolls in the hold of the ship, and on one occasion even into the water. Rolls engaged by the Jensen Gear in remote corners of the hold were dragged across other rolls in order to bring them to the hatch location for lifting from the ship. Some of the rolls were pulled from the bottom of stacks to cause the rolls above them to fall onto each other so that they could be unloaded more easily. Rolls which were stacked on end in the hold of the vessel were used as a floor surface on which forklift trucks moved about without using protective floor boards. Some rolls were pushed around in the hold of the vessel by the forks of the forklift trucks. Also, some rolls fell off the flatbed trucks that were transporting the rolls from the ship side into the terminal warehouse. As a result of these methods of handling, which were utilized during the entire unloading procedure, substantial damage was caused to the cargo in the nature of cuts and gouges to the ends of the rolls, cuts and gouges in the webs (or faces), damage to the wrappings, crushed roll cores, and crushed rolls.

One witness, who observed the unloading process and who had a lifetime of experience in unloading paper, characterized this unloading as a "disaster in progress." The captain of the vessel described the unloading as so problematical that he found it necessary to write a letter of protest to Maher Terminals. He said he also protested orally each day. The superintendent of Maher Terminals euphemistically conceded at trial that "production could have been better." The terminal warehouse, which had begun tallying the damage as each roll was entered into the warehouse, fell so far behind because of the extent of damage that it abandoned all efforts of taking specific exceptions and simply took a general exception to the entire shipment.

The cargo was thereafter trucked from the warehouse to customers, who complained that the rolls could not be used in high speed printing presses. They threatened to reject the shipment to them. A roll that was out of round would not fit on the spindles of high speed presses. A roll that had cuts or gouges on the end would manifest a nick at the edge of each layer of paper as it unrolled, which would cause the high speed presses to jam. Cuts or gouges on the web or face were less problematical because the roll could be unwound to the point where the web cut ended, but the roll still had to be processed, with some loss of product.

Bruzzone, on behalf of and at the direction of CRDM and CIR negotiated settlements with these customers, ultimately permitting them a 40% discount of the purchase price. One customer made no claim. Another, Perkins–Goodwin, Inc. (P-G), took the entire shipment and has joined as a plaintiff to recover the damages it sustained. P-G was a paper broker and it has made claim for the losses it incurred in attempting to sell the damaged paper to its customers.

The quantum of damages claimed by the plaintiffs is based on the reasonableness of the settlements in light of estimates of damage. Much of their evidence on the estimates of actual damage is based on samples of the cargo. No roll-by-roll survey was done on the entire cargo by any party and no such proof was available.

Maher Terminals contends that because the claims for damages sustained by the

plaintiffs were not based on a 100% roll-by-roll analysis, plaintiffs failed in their burden of proof. "Maher asserts that just as the nature of the claim required a reel-by-reel joint survey, the evaluation of the damage proofs requires a bill of lading by bill of lading analysis." (Post–Trial Brief of Defendant Maher Terminals, p. 1) They point to difficulties that arise in the absence of such a survey in attempting to determine whether the plaintiffs have adequately identified damage to rolls covered by the bills of lading which are still the subject of the claims in suit or to rolls not included in plaintiffs' suit. The cargo covered by three bills of lading are not the subject of any claim because the customer made no claim to plaintiffs, and damages to the cargo loaded at Arbatax were settled before trial. Maher Terminals contends that the generalized proof offered by plaintiffs is a failure of proof.

The difference between the amount of damage claimed by the plaintiffs and the amount that the defendants allow has been proved is substantial. The plaintiff P–G claims $266,207.29 plus prejudgment interest. The remaining plaintiffs claim $716,-649.26. The total claim by the plaintiffs, therefore, is something less than $1 million. While the defendant has not offered an alternative amount to be entered as damage, it urges that only a small fraction of damage has been demonstrated, and because even that fraction cannot be identified to particular rolls or particular bills of lading, the plaintiffs should not recover.

No serious question is raised as to liability and to the fact of damage. The thrust of the defense of Maher Terminals relates to the method of proof offered for the computation of damage.

## II

Raymond A. Gercke, Jr., an experienced marine surveyor who had surveyed approximately 30 paper shipments before the one in question, testified on behalf of plaintiffs that he witnessed the entire unloading process as a representative of one of the insurance carriers for the plaintiffs. He testified that 50% of the cargo that was unloaded from the M/V BLUE EAGLE had been damaged in the handling process, that virtually all the rolls sustained some damage to their wrapping, and that approximately 30% to 40% of the invoice value should be set aside as reserves for losses. He did concede on cross examination, however, that his estimate of 30% to 40% was a "curbstone" opinion and was not based on a roll-by-roll survey. During the course of the unloading process, Mr. Gercke took photographs that corroborated the fact of damage caused by the unloading process.

After the cargo was placed in the terminal warehouse and despite the damage, Bruzzone began to ship cargo to customers who had ordered it. The cargo covered by bill of lading no. 1 was shipped to a customer named Schmidt. When Schmidt complained about the condition of the cargo and threatened to reject it, plaintiffs retained another surveyor, Mr. John Robert Benjamin, to assess the damage more completely.

Mr. Benjamin conducted his survey during September, 1984, several weeks after the unloading process. He testified that the cargo he saw was in "horrible condition." He proceeded to assess a depreciation value for the cargo covered by each bill of lading that was at issue in this case except for that which had been shipped to the plaintiff P–G and that which had been shipped on bill of lading no. 1 to Schmidt. The depreciations that Mr. Benjamin assessed for each of the bills of lading (B/L) were: B/L 2—50%; B/L 3—45%; B/L 4—40%; B/L 5—40%; B/L 6—45%; B/L 7—40%; B/L 8—40%; B/L 14—45%; B/L 15—45%; B/L 10—40%; B/L 11—35%. He also assessed the cargo covered by bill of lading 17 which consisted of 41 skids of flat sheets of paper. He determined that 34 of them were acceptable and 7 were damaged and would have to be salvaged. Mr. Benjamin transmitted his findings to Bruzzone by telephone in late September, 1984, and wrote a letter detailing the percentages in October, 1984. He also documented his findings with photographs.

Following Mr. Benjamin's survey in September, 1984, all parties, including Maher

Terminals, agreed to undertake a joint roll-by-roll survey. This was done in October and November, 1984, and covered the 1,266 rolls that then remained. Participating in the roll-by-roll survey were surveyors representing the owners of the BLUE EAGLE, Maher Terminals, and an Italian surveyor appointed directly by the Italian underwriters. An analysis of this survey that was presented by the defendant Maher Terminals revealed that 444 rolls had no damage and 270 had only packing damage or minor web damage that was not considered significant. Therefore, the remaining 552 rolls sustained significant damage including several hundred with crushed cores. The total that sustained the significant damage thus constituted 44% of those surveyed. Mr. Benjamin, the surveyor who had conducted his survey in September, 1984, testified that in his opinion this roll-by-roll survey verified his earlier estimate that 35% to 50% of the cargo value should be depreciated.

Finally, the plaintiffs and their underwriters engaged the services of Morton B. Konig, an expert in the evaluation, sale, marketing, and surveying of paper. He testified that in October, 1984, he examined approximately 2,000 rolls of paper and observed the same kind of damage as had been described by all witnesses, i.e. torn wrappers, gouges and cuts in the ends and webs, and crushed cores. He also observed some entire rolls out of round, rolls with squashed edges, and rolls with dirt embedded in the ends. He characterized the condition of the cargo as "deplorable" and explained how these damages were fatal to the use of the rolls on high speed printing presses for which they were designed. He testified that approximately 95% of the rolls had some degree of damage and that 40% had suffered major damage so that they could not be used on the high speed presses. He testified that a fair and perhaps understated estimate of the loss would be 35% to 40% of the invoice price. He too reported his results to the Italian shipper and to Bruzzone.

In addition to the testimony of the witnesses who surveyed the cargo, plaintiffs presented evidence relating to the exigencies of reaching settlements with customers. Customers of plaintiffs were demanding discounts on the order of 50% of invoice price. These were long standing customers of plaintiffs who were apparently knowledgeable in the paper business and expressed a belief they could reject the entire shipment. Whether they were correct, plaintiffs were confronted with an apparently serious customer relations problem. Based on customer demands and threats, the joint survey, and the reports of Messrs. Benjamin and Konig, the manufacturers of the paper authorized Bruzzone to negotiate settlements with the customers for a 40% discount of the invoice price. The evidence showed that Bruzzone was able to negotiate a 40% discount with all customers except one who demanded and was given a 50% discount. Plaintiffs nevertheless are only claiming in the litigation 40% with respect to that customer. The total loss attributed to the discounts negotiated by Bruzzone amounted to $711,000.77.

As for Perkins–Goodwin, the cargo was shipped directly to it and it offered proof of discounts to customers and of failed transactions where it could not sell the paper and had to salvage it. Its loss for the cargo covered by bills of lading 12, 16, 18, 19, and 22 were $250,598.23 plus lost profit of $14,510.81 for a total of $265,109.04. These losses proved by P–G were market losses, and by coincidence, they fell into the same range as those negotiated by Bruzzone. P–G's loss was 43.26% of invoice value.

The total claimed by plaintiffs is $982,856.55 representing P–G's loss of $265,109.04, the manufacturers' losses of $711,000.77, incremental warehouse expenses, and a surveying expense. They also claim prejudgment interest.

### III

The question presented is whether plaintiffs' evidence amounts to adequate proof of the quantum of damage to justify a judgment against the defendant. Stated somewhat differently, may the plaintiffs

recover by way of indemnity in this action the 40% discount that they lost in their settlements with the customers. As the plaintiffs stated,

> [They] were faced with a "no-win" situation. Either they granted their customers who had not yet paid for the cargo a discount on the selling price, or they would have faced total rejection of the cargo by those customers. Moreover, they were faced with increasing expenses in the form of storage charges, the longer the cargo remained at the cargo pier/warehouse. As a practical matter, the question was not whether to agree to a discount but rather what percentage of discount was reasonable, as justified by the quantity and nature of the damage that the paper rolls had suffered.

(Plaintiffs' Post–Trial Brief on Damages, p. 14.)

No doubt it would have been a more perfect case to have had a roll-by-roll survey with an estimate of damage provided for each roll. But in the circumstances, the imperfections of proof should not inure to the benefit of the tortfeasor. Once a plaintiff shows the fact of damage, the precise amount of damage need not be shown with mathematical certainty. On the other hand, damages should not be the subject of conjecture or speculation. The plaintiffs must present sufficient evidence from which damages can be determined on a rational basis. *See Amstar Corp. v. M/V ALEXANDROS T,* 472 F.Supp. 1289 (1979), *aff'd* 664 F.2d 904 (4th Cir.1981). The Court concludes that this was done.

█ It is an appropriate measure of damage for the plaintiff to seek the difference between the sale price of goods and the salvage price of goods measured by settlements reached with the customers when it can be shown that such settlements were reasonable. In determining the reasonableness of a settlement, the Court should take into account the risk of further loss, the duty to mitigate damages, and the extent to which the settlement deviated from the actual loss. While the nature of such an analysis must be structured in

light of the circumstances confronting the plaintiff, plaintiff's efforts will be measured against the equitable principle that the plaintiff, when settling, acts as a fiduciary of the indemnitor from whom it will ultimately seek recovery.

To be sure, a plaintiff cannot expect to recover losses occasioned by a course of conduct that was pursued after having been damaged which is unreasonable in the circumstances facing the plaintiff at the time. On the other hand, it is not a challenge to reasonableness to look in hindsight and show that the plaintiff could have taken another course that would have lessened the damage.

The plaintiffs in this case, who were confronted with the decision whether to ship the cargo to customers and sell what could still be sold or to retain the cargo in the warehouse for all parties to survey at the risk of additional loss, chose to ship the paper and attempt to sell it. The course of shipping the paper to customers and negotiating a discount price might well not have yielded a perfect result, but the question for review now is not whether the amount of loss was precise but whether the decision made at the time was a reasonable one.

> The plaintiff's burden of establishing the reasonableness of the settlement is that of "satisfying the district court that it had acted in accordance with equitable indemnity principles in making the settlement and had not spent its indemnitors' money too freely."

*Toko Kaiun Kaisha Ltd. v. T. Smith & Son, Inc.,* 1987 A.M.C. 31, 39 (E.D.La.1983) (citing and quoting from *Parfait v. Jahncke Service, Inc.,* 484 F.2d 296 (5th Cir.1973), *cert. denied* 415 U.S. 957, 94 S.Ct. 1485, 39 L.Ed.2d 572 (1974)).

In this case the Court finds that the evidence supported the reasonableness of plaintiffs' decision. The risk of loss confronting the plaintiffs because customers might reject the shipments altogether outweighed the benefit that might result from retaining all paper, surveying it roll by roll, and salvaging it. Plaintiffs' judgment is corroborated by independent evidence that

the cargo sustained approximately a 40% decrease in value by reason of the mishandling during unloading. Confronted with demands by customers to settle for a 50% discount, and in view of the other factors present, it cannot be said therefore that plaintiffs' settlements in the range of a 40% discount were unreasonable.

■ The evidence that corroborated the reasonableness of the 40% settlements included the testimony of Mr. Gercke, who testified that 50% of the entire cargo had been damaged and that in his "curbstone" judgment 35% to 40% of the cargo's value should be reserved for loss. In addition, Mr. Benjamin, who observed more than half of the cargo, concluded that based on what he saw 35% to 50% of the cargo's value should be depreciated as lost. And Mr. Konig, who examined a smaller sample, corroborated Mr. Benjamin. The joint survey conducted by all the parties in connection with 1,266 rolls, while only constituting perhaps a one-third sample of the entire Naples cargo, did not present inconsistent evidence. The finding of the joint survey was that 44% of the rolls was substantially damaged. Finally, the independent market experience of P–G, who sold or salvaged rolls that were not subject to the surveys, showed a 43% loss. It is true that the only observation of the entire cargo was by Mr. Gercke, who could only give a curbstone estimate, albeit an experienced one, the samples by other surveyors, who were able to be more precise, were sufficiently large and diverse samples to confirm Mr. Gercke's judgment.

It is recognized that in cargo cases reasonable estimations of damages extrapolated from a sampling of the cargo may be an appropriate means of computing an amount of damage, when the fact of damage has been proven with reasonable certainty. In *Amstar Corp. v. M/V ALEXANDROS T.*, 472 F.Supp. 1289, 1297 (1979), *aff'd* 664 F.2d 904 (4th Cir.1981), Judge Harvey stated:

> An estimation of damages extrapolated from a sampling of the cargo has been recognized as an appropriate and practical means for determining the amount

of an award. *Compagnie de Navigation, etc. v. Mondial United Corp.*, 316 F.2d 163, 171 (5th Cir.1963). So long as a reasonably representative sample has been taken and so long as the sample is sufficient to indicate fairly the quality, condition and nature of damage to the whole cargo, a sampling method will be upheld as a reasonable basis for projecting damages. *Id.* at 170–171; *Interstate Steel Corp. v. SS CRYSTAL GEM*, [317 F.Supp. 112, 117–18 (S.D.N.Y. 1970)].

In summary, when considering the factors presented in this case—the potential loss of sales of the salvageable cargo, the potential increase in expenses of retaining the cargo, the effort to mitigate loss and negotiate a reduced amount that was pursued by the plaintiffs, the evidence of actual damage by direct observation and by sampling, and the extremely clear fact of damage to the entire cargo (as distinguished from an isolated incident)—the Court concludes that the settlement undertaken and reached by the plaintiffs of discounting the invoice value by 40% was a reasonable one and therefore properly forms the basis for computing the damages claimed by plaintiffs.

Accordingly, the Court finds that plaintiffs CIR and CRDM were damaged in the amount of $711,077 representing the loss sustained by them when they negotiated 40% discounts of certain bills of lading of the Naples cargo. Likewise, P–G has shown and the Court so finds that the cargo covered by the five bills of lading shipped to it were damaged to the extent of $250,598.23. It will also be entitled to its lost profit on the contracts that it had negotiated for this cargo in the amount of $14,510.81.

CRDM and CIR provided proof of their increased storage charges in the amount of $5,648.49, and P–G showed a similar loss in the amount of $492.50.

While P–G incurred a survey fee of $605.75, the fee was not necessarily incurred by the mishandling of defendant's product and will therefore not be allowed.

Finally, the Court finds that no exceptional circumstances are presented to avoid the general rule of allowing prejudgment interest in a maritime case as this. *See Reeled Tubing, Inc. v. M/V CHAD G,* 794 F.2d 1026, 1029 (5th Cir.1986); *Independent Bulk Transport, Inc. v. M/V MORANIA ABACO,* 676 F.2d 23, 27 (2d Cir.1982); *Amstar Corp. v. M/V ALEXANDROS T,* 472 F.Supp. 1289, 1300 n. 18 (D.Md.1979), *aff'd* 664 F.2d 904 (4th Cir.1981). Interest will be allowed as requested at the rate equalling tne average yield of three-month treasury bills. Plaintiffs pray that interest run from August 24, 1984, the day that the unloading of the M/V BLUE EAGLE was completed. However, because plaintiffs would not have received payment until the delivery of the cargo and arrangements for payment had been accomplished, interest will be allowed from 30 days after the unloading, i.e. from September 23, 1984.

A separate judgment will be entered that implements these findings of the Court.

### JUDGMENT

For the reasons given in the Court's opinion of this date, Judgment is entered this 1st day of May, 1989, by the United States District Court for the District of Maryland:

1. In favor of plaintiffs Cartiere Reunite Donzelli E Meridonali S.p.A. and Cartiere Italiane Reunite S.p.A. and against defendant Maher Terminals, Inc. in the amount of $716,649.26 plus prejudgment interest on that amount at the rate of the average yield of a three-month Treasury Bill from September 23, 1984, through the date of this Judgment; and

2. In favor of plaintiff Perkins–Goodwin Company, Inc. and against defendant Maher Terminals, Inc. in the amount of $265,601.54 plus prejudgment interest at the rate of the average yield of a three-month Treasury Bill from September 23, 1984, through the date of this Judgment;

3. With the defendant Maher Terminals, Inc. to pay costs.